**TEXASGULF, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 532–83 T.**

United States Claims Court.

June 20, 1989.

Willard B. Taylor, New York City, for plaintiff.

Stuart J. Bassin, Washington, D.C., with whom was the Asst. Atty. Gen., for defendant.

## OPINION

HORN, Judge.

On August 22, 1983, the plaintiff, Texasgulf, Inc., filed its original complaint claiming entitlement to refunds for overpayments of income tax with respect to the taxable years ending December 31, 1968 and December 31, 1969. The plaintiff seeks a foreign tax credit pursuant 26 U.S.C. § 901(a), for taxes paid in Canada in accordance with the Ontario Mining Tax, in 1968 and 1969, and for taxes which were carried back from 1970 to 1968 and 1969, for tax credit pursuant to the carryback provision of the foreign tax statutes, 26 U.S.C. § 904(c).

This case was originally assigned to The Honorable Reginald W. Gibson, before whom the parties' cross-motions for partial summary judgment were originally filed and briefed. Prior to a decision by Judge Gibson, the case was transferred to this Judge. This court subsequently held an oral argument and requested additional filings from the parties.

The original complaint contained three issues. Only one of the three issues is the subject of this opinion: whether taxes paid under the Ontario Mining Tax are creditable under 26 U.S.C. § 901(a) against the United States federal income tax obligations of Texasgulf, Inc., for the years 1968 and 1969. A second issue, pertaining to the application of 26 U.S.C. § 901(e), has not been briefed at this time by either party. A third issue, the subject of plain-

tiff's cross-motion for partial summary judgment, was disposed of by stipulation of the parties on July 2, 1985.

On January 15, 1985, the defendant filed a Motion for Partial Summary Judgment on the first issue. In its motion, the defendant contends that the Ontario Mining Tax is not an income tax cognizable under United States law and, therefore, cannot be credited against Texasgulf, Inc.'s United States tax liability pursuant to 26 U.S.C. § 901(a). The plaintiff, however, opposes defendant's motion based on the alleged existence of genuine issues of material facts, which plaintiff claims can only be resolved at trial.

For the reasons discussed more fully below, the defendant's Motion for Partial Summary Judgment is, hereby, GRANTED.

### Background

Plaintiff, Texasgulf, Inc., is a United States corporation organized in accordance with the laws of the State of Delaware, and is in the business of extracting, processing and marketing phosphate, sulphur and other minerals. Texasgulf, Inc., a Delaware Corporation, is the successor, by merger, to Texas Gulf, Inc., a Texas Corporation, which filed consolidated United States income tax returns for 1968, 1969 and 1970, under the name Texas Gulf Sulphur Company, the common parent of an affiliated group of corporations. The group includes Ecstall Mining Limited ("Ecstall"), a foreign subsidiary of Texasgulf, Inc. Organized under Canadian laws, Ecstall began operation of the Kidd Creek Mine located in Ontario, Canada in 1966. The Kidd Creek orebody was rich in copper, zinc, lead and silver. During the years 1968 through 1970, Ecstall had no ongoing operations other than the Kidd Creek Mine.

Ecstall filed a Canadian income tax return in 1968, 1969 and 1970, the years at issue in this case. However, due to a provision of the Income Tax Act of Canada in effect during 1968 and 1969, Ecstall paid no Canadian federal or Ontario provincial income taxes for 1968 and 1969. This provision allowed a corporation, when calculating its taxable income, to exclude income derived from the operation of a mine during the first three years of operation, beginning with the day on which the mine came into production.

Ecstall also filed an Ontario Mining Tax return in 1968, 1969 and 1970. Unlike the Canadian income tax, which is administered by the Canadian Department of National Revenue, the Ontario Mining Tax is administered by the Province of Ontario, Department of Mines. Pursuant to the Ontario Mining Tax Act of 1968, the Ontario Mining Tax Amendments Act, 1968–1969 and the Ontario Mining Tax Act of 1970, which are all part of the Revised Statutes of Ontario, Ecstall paid $6,746,024.12, $7,115,468 and $7,023,379 in mining tax to the Canadian Minister of Mines for the years 1968, 1969 and 1970, respectively.

In 1968, 1969 and 1970, Texasgulf, Inc. paid United States federal income tax on behalf of Ecstall.[1] Expenses associated with royalties, interest and depletion were among the deductions claimed on behalf of Ecstall on its United States tax returns. The following table, submitted by the plaintiff, demonstrates (in United States Dollars) the 1968, 1969 and 1970 deductions which Ecstall claimed on its consolidated United States tax returns as well as the total of the three deductions for those years:

|  | Royalties | Interest | Depletion | Total |
|---|---|---|---|---|
| 1968 | $3,018,500 | $ 7,035 | $12,862,406 | $15,880,913 |
| 1969 | $2,747,247 | $ 607 | $12,504,266 | $15,252,120 |
| 1970 | $5,203,018 | $144,195 | $23,930,507 | $18,277,720. |

1. The United States federal income tax returns of Texas Gulf Sulphur Company for 1968, 1969 and 1970 were included in the "Documents Submitted Pursuant To Paragraph III 2(a) of Pre-Trial Order" submitted in response to Judge Gibson's pretrial order, issued February 16, 1984. Although these documents, were not filed as part of the official court record at the time of their receipt on January 2, 1985, the pretrial order issued by Judge Gibson required that they be served simultaneously on the defendant and on the court. The documents have now, however, also been formally filed with the court.

In September 1969 and September 1970, Texasgulf filed its consolidated United States corporate income tax returns for 1968 and 1969, respectively. On December 15, 1971, Texasgulf filed claims for refunds with the Manhattan District Director of Internal Revenue for overpayments of income tax for 1968 and 1969. Texasgulf sought allowance of foreign tax credit for Ontario Mining Tax paid in 1968 and 1969 and Ontario Mining Tax paid in 1970 and carried back to 1968 and 1969. In connection with an audit and examination of Texasgulf's United States federal income tax returns for 1966 through 1971, the Manhattan District Director, pursuant to 26 U.S.C. § 901(e),[2] proposed to deny the aforementioned foreign tax credits and to reduce them by the amount of foreign tax credit allowable for taxes paid to Canada and the respective province thereof in 1970 and carried back to 1968 and 1969. In a protest filed with the Manhattan District Director on January 26, 1979, Texasgulf objected to the Manhattan District Director's denial of a foreign tax credit for Ontario Mining Tax paid in 1968 and 1969, the denial of a foreign tax credit for Ontario Mining Tax paid in 1970 and carried back to 1968 and 1969, as well as the reduction of foreign tax credit allowable for taxes paid to the federal government of Canada and political subdivision thereof in 1970. On September 2, 1981, the Regional Commissioner of Internal Revenue denied the refunds, including the carrybacks, for 1968 and 1969 and the allowance, without reduction of foreign tax credit, for taxes paid to the federal government of Canada and political subdivisions thereof, in 1970 and carried back to 1968 and 1969.

The original complaint in this court was filed by Texasgulf on August 22, 1983. The original complaint contained three issues: (1) whether taxes paid by Ecstall under the Ontario Mining Tax are creditable under 26 U.S.C. § 901(a) against the United States federal income tax obligations of Texasgulf, Inc. for the years 1968 and 1969; (2) whether taxes paid by Ecstall to the federal government of Canada and its political subdivisions in 1970 and carried back to 1968 and 1969 on Texasgulf's United States federal income tax returns, were subject to reduction under 26 U.S.C. § 901(e); and (3) whether Texasgulf, Inc. is entitled to the Western Hemisphere Trade corporation deduction for 1968 and 1969. The second issue, pertaining to 26 U.S.C. § 901(e), has not been briefed by either party and is not the subject of this opinion. On January 15, 1985, the defendant filed a Motion for Partial Summary Judgment on the first issue (whether the Ontario Mining Tax is creditable under 26 U.S.C. § 901(a)). On February 15, 1985, the plaintiff filed a Cross–Motion for Partial Summary Judgment on the Western Hemisphere Trade corporation issue. The Western Hemisphere Trade Corporation issue was disposed of by stipulation of the parties on July 2, 1985. Therefore, the Motion for Partial Summary Judgment by the United States on the first issue listed above, is the only motion addressed in this Opinion.

Following oral argument on Defendant's Motion for Partial Summary Judgment, this court requested additional filings from the parties addressing whether there remain issues of material fact in dispute, and if so, detailing the specifics of such remaining issues. Although the government has conceded that the Ontario Mining Tax was

---

**2.** (e) *Foreign taxes on mineral income.*
(1) *Reduction in amount allowed.*
Notwithstanding subsection (b), the amount of any income, war profits, and excess profit taxes paid or accrued during the taxable year to any foreign country or possession of the United States with respect to foreign mineral income from sources within such country or possession which would (but for this paragraph) be allowed under such subsection shall be reduced by the amount (if any) by which—

(A) the amount of such taxes (or, if smaller, the amount of the tax which would be computed under this chapter with respect to such income determined without the deduction allowed under section 613), exceeds
(B) the amount of the tax computed under this chapter with respect to such income.
26 U.S.C. § 901(e) (1982).

not imposed on unrealized income, two questions remain in dispute: (a) whether the interest, depletion and royalties for which no deduction is allowed in computing the Ontario Mining Tax are "significant," and (b) whether the processing allowance of the Ontario Mining Tax effectively compensates for the disallowed deductions. Both of these questions are directed at determining whether the Ontario Mining Tax is based on net income and is, therefore, an "income tax" as that term is understood in United States tax law.

## Discussion

Rule 56 of the Rules of the United States Claims Court (RUSCC) and Rule 56 of the Federal Rules of Civil Procedure (Fed.R. Civ.P.) are similar in language. Rule 56(c) of both rules provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

RUSCC 56(c), 28 U.S.C. (Supp. IV 1986); Fed.R.Civ.P. 56(c) 28 U.S.C. (1982). In addition, Rule 56(f) of the Rules of the United States Claims Court, RUSCC 56(f), 28 U.S.C. (Supp. IV 1986), which is quite similar to Rule 56(e) of the Federal Rules of Civil Procedure, Fed.R.Civ.P. 56(e), 28 U.S.C. (1982), includes the following provision:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

RUSCC 56(f), 28 U.S.C. (Supp. IV 1986).

It is also clear from case law that "[o]n summary judgment the inferences to be drawn from the underlying facts contained in such materials [such as affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *see also Big Chief Drilling Co. v. United States,* 15 Cl.Ct. 295, 298 (1988) (quoting *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam) and citing *Gregory Lumber Co. v. United States,* 9 Cl.Ct. 503 (1986)). In the instant case, the evidence submitted to the court must be viewed in favor of the plaintiff, Texasgulf, since the United States is the moving party.

The Supreme Court has refined the standard for courts to apply when considering a motion for summary judgment where the non-moving party bears the burden of proof at trial. *See generally Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears, not only the responsibility of informing the court of the basis for its dispositive or partially dispositive motion, but also the initial burden of identifying those portions of the record, together with the affidavits, if any, which that party believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2553. However, "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the . . . court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. at 2553. In a case such as *Celotex Corp. v. Catrett,* where the non-moving party bears the burden of proof at trial, the moving party can meet its initial burden by showing that there is an absence of evidence in the record necessary to prove an element of the non-moving party's case.

In *Anderson v. Liberty Lobby, Inc.*, the United States Supreme Court stated that on a motion for summary judgment "the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby Inc.*, 477 U.S. at 254, 106 S.Ct. at 2513. Therefore, in determining whether there is an absence of evidence in the record necessary to prove an element of the non-moving party's case, the court must consider the non-moving party's substantive, evidentiary burden at trial. As stated in *Anderson*, the relevant inquiry on a motion for summary judgment in determining whether a genuine issue exists, is "whether the evidence presented is such that a jury [or judge] applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255, 106 S.Ct. at 2514.

The question of whether a genuine issue of fact exists is independent of the materiality inquiry which rests on "the substantive law's identification of which facts are critical and which facts are irrelevant" in deciding the case. *Id.* at 248, 106 S.Ct. at 2510. A material fact is one which affects the outcome of the case because it has a bearing on the satisfaction or nonsatisfaction of an element of the applicable substantive law. Typically, in ruling on a motion for summary judgment, the court first looks to see if the fact in issue is material. Regardless of whether an issue of fact exists, if the fact in issue is not material to the case, the motion for summary judgment may be granted. If the fact in issue is material, the court must inquire as to whether a genuine issue exists for trial.

In accordance with *Anderson*, in the instant case, in order to determine the material facts in issue, the court must examine the applicable tax law necessary to resolve Texasgulf's claims. Sections 901(a) and 901(b) of the Internal Revenue Code,[3] allow a taxpayer to credit the amount of any income taxes paid to a foreign country against the taxpayer's United States income tax, so long as the amount is not in excess of the maximum credit allowable under section 904(a) of the Internal Revenue Code. 26 U.S.C. § 904(a) (1982).

For a tax paid to a foreign country to be creditable to tax accounts paid to the United States, "the foreign tax must be the substantial equivalent of an income tax as that term is understood in the United States." *Inland Steel Co. v. United States*, 677 F.2d 72, 79, 230 Ct.Cl. 314, 325 (1982) (citing *Biddle v. Commissioner*, 302 U.S. 573, 58 S.Ct. 379, 82 L.Ed. 431 (1938); *Allstate Ins. Co. v. United States*, 419 F.2d 409, 413–14, 190 Ct.Cl. 19, 25–28 (1969); *Missouri Pacific R.R. v. United States*, 392 F.2d 592, 597, 183 Ct.Cl. 168, 175 (1968)).

The foreign tax credit makes available a tax benefit to electing taxpayers, which benefit takes the form of a dollar for dollar reduction in tax liability. The foreign tax credit is designed to avoid the possibility of double taxation on the same income. The double taxation could arise from operations outside the United States when a United States taxpayer is taxed by a foreign jurisdiction and then taxed by the United States, because of its policy of taxing income from whatever source derived. In 1942, Congress extended the scope of the foreign tax credit so as to take into account

---

**3.** § 901. *Taxes of foreign countries and of possessions of United States.*

(a) *Allowance of credit*
If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the applicable limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of the corporation, the taxes deemed to have been paid under sections 902 and 960. Such choice for any taxable year may be made or changed at any time before the expiration of the period prescribed for making a claim for credit or

refund of the the tax imposed by this chapter for such taxable year. . . .

(b) *Amount allowed*
Subject to the applicable limitation of section 904, the following amounts section shall be allowed as the credit under subsection (a):
  (1) *Citizens and domestic corporations*
In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States. . . .
26 U.S.C. § 901 (1982).

proportionate foreign taxes of a foreign subsidiary corporation.

A taxpayer is entitled to a deduction for foreign taxes paid or accrued, Treas.Reg. § 1.901–1(c) (1984), unless an election is made for the foreign tax credit. 26 U.S.C. § 901(a) (1982). The foreign tax credit is applicable only to certain types of taxes, generally foreign income taxes, 26 U.S.C. § 901(b) (1982), while the deduction for foreign taxes extends to other foreign taxes. 26 U.S.C. § 164 (1982). If the foreign tax credit is elected for foreign income taxes paid or accrued, no deduction for such taxes is allowed. Treas.Reg. § 1.901–1(c) (1984).

The foreign tax credit is elected by filing, along with the claim for credit, Form 1118 in the case of a corporation and Form 1116 in the case of an individual. Treas.Reg. § 1.905–2(a) (1984). Section 905(b) of the Internal Revenue Code, 26 U.S.C. § 905(b) (1982), provides that the taxpayer must be able to establish the elements relevant to the computation of the credit. Not all foreign taxes are eligible for the foreign tax credit. First, only "income, war profits, and excess profits taxes paid or accrued during the taxable year," 26 U.S.C. § 901(b) (1982), or taxes paid or accrued "in lieu of" such taxes, 26 U.S.C. § 903 (1982), are eligible for the credit. Such taxes, however, are not creditable, if they are in the nature of a subsidy. Otherwise creditable foreign taxes are reduced in amount for the purposes of computing United States tax liability in the case of certain foreign mineral income, 26 U.S.C. § 901(e) (1982), and are disallowed in total for certain oil and gas operations. 26 U.S.C. § 901(f) (1982). Second, only such taxes paid or accrued to certain foreign countries on United States possessions are creditable, and finally, except for taxes deemed paid, the taxes must be paid or accrued by the taxpayer during the taxable year. 26 U.S.C. § 901 (1982).

The Internal Revenue Service Regulations associated with section 901 of the Internal Revenue Code state that the determinations of whether a foreign levy is creditable is made based upon whether the levy is a tax and then upon whether the predominant character of the tax is an income tax. Treas.Reg. § 1.901–2(a)(1) (1984). If the foreign tax is a compulsory payment pursuant to that foreign jurisdiction's authority to levy taxes, in a United States tax sense, the foreign tax is likely to be treated as a creditable foreign tax. However, it is clear that penalties, fines, interest and customs duties are not taxes. Treas.Reg. § 1.901–2(a)(2) (1984).

The predominant character of the foreign jurisdiction's tax, as an income tax in a United States sense, is met if the foreign tax is likely to reach net gain under the normal circumstances in which it is applied and then, only if it is not dependent upon the availability of credit by another country. Treas.Reg. § 1.901–2(a)(3) (1984). A foreign tax is likely to reach net gain if it satisfies a realization test, a gross receipts test, and a net income test. Treas.Reg. § 1.901–2(b)(1) (1984). A failure to meet all of these tests would result in a finding that the foreign tax is not likely to reach net gain and is not an income tax in the United States sense.

The realization test requires that the tax be imposed on transactions which would normally give rise to United States tax liability. Treas.Reg. § 1.901–2(b)(2) (1984). The gross receipts test requires that the foreign tax be imposed upon gross receipts or using a method of calculating the foreign tax that is not likely to produce an amount greater than the fair market value. Treas.Reg. § 1.901–2(b)(3) (1984). The net income test requires that gross receipts are reduced by costs and expenses applied under reasonable principles. Treas.Reg. § 1.901–2(b)(4) (1984).

At issue in this case is whether Treasury Regulation section 1.901–2, which was promulgated by the Internal Revenue Service in 1983 after the issuance of the opinion in *Inland Steel Co. v. United States*, changes the pre-existing law relating to foreign tax credit. In relevant part, the United States Court of Claims in *Inland Steel Co.* held that the Ontario Mining Tax was not an income tax in the United States sense. *Inland Steel Co. v. United States*,

677 F.2d 72, 230 Ct.Cl. 314 (1982). The preamble to the final regulations, 48 Fed. Reg. 46272 (1983), which precedes Treasury Regulation section 1.901–2 as promulgated, states that:

Under these final regulations, the predominant character of a foreign tax is that of an income tax in the United States sense if the foreign tax is likely to reach net gain in the normal circumstances in which it applies. This standard, found in § 1.901–2(a)(3)(i), adopts the criterion for creditability set forth in *Inland Steel Company v. U.S.*, 677 F.2d 72 [230 Ct.Cl. 314] (Ct.Cl.1982), *Bank of America National Trust and Savings Association v. U.S.*, 459 F.2d 513 [198 Ct.Cl. 263] (Ct.Cl.1972), and *Bank of American National Trust and Savings Association v. Commissioner*, 61 T.C. 752 (1974). The regulations set forth three tests for determining if a foreign tax is likely to reach net gain: the realization test, the gross receipts test, and the net income test. All of these tests must be met in order for the predominant character of the foreign tax to be that of an income tax in the United States sense.

48 Fed.Reg. 46272, 46273 (1983). The Federal Register preamble continues with a discussion concerning the three tests set forth in Treasury Regulation section 1.901–2(b):

Paragraph (b)(2) of § 1.901–2 states that the realization test is met if the predominant character of the foreign tax is that of tax imposed on income at the time or after the time income would be realized under the Internal Revenue Code. The test can also be satisfied even if the tax is imposed prior to a realization event if the tax recaptures a tax deduction, tax credit or other tax allowance previously accorded the taxpayer. In addition, the test can be satisfied if the foreign tax is imposed on the appreciation in value of property or on the value of certain inventory property at the time of transfer, processing, or export, but only if such amounts are not subject to foreign tax at a later time, or, if they are subject to tax, a credit is given for the earlier tax. Certain foreign taxes imposed on the deemed distribution of profits also satisfy the realization test.…

The gross receipts test set forth in paragraph (b)(3) of § 1.901–2 is satisfied if the predominant character of the foreign tax is that of a tax imposed on the basis of gross receipts. The regulations also allow a tax imposed on a base of estimated gross receipts if the method used is likely to produce an amount that is not greater than fair market value.…

The third test of the regulations is whether the predominant character of the foreign tax is that of a tax on net income. Paragraph (b)(4) of § 1.902–2 states that a tax imposed on a base of gross receipts reduced by significant costs and expenses (including capital expenditures) attributable to that income is a tax on net income. Certain formulary methods of computing taxable income satisfy this test. In rare cases where income is of a type (such as wages) that generally does not have significant related expenses, a foreign tax may be considered to be imposed on net income even if no deductions are allowed.

*Id.*

The commissioner's interpretation and application of Treasury Regulation section 1.901–2, in the instant matter, promulgated by the Internal Revenue Service to be in accord with the Court of Claims holding in *Inland Steel Co. v. United States,* is entitled to this court's respect. *See Jewett v. Commissioner,* 455 U.S. 305, 318, 102 S.Ct. 1082, 1090, 71 L.Ed.2d 170 (1982). Indeed, as noted by the Supreme Court in the past the Treasury Regulations "command our respect, for Congress has delegated to the Secretary of the Treasury … the task of 'administering the tax laws of the Nation.'" *Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981) (quoting *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973)). In the case at bar, the Commissioner's decision to deny foreign tax credit to the Ontario Mining Tax is, in view of the reliance found in the preamble to the regulation on

the principle holding of *Inland Steel Co.*, likewise, entitled to deference by the courts.

The Ontario Mining Tax is levied by the Minister of Mines of Ontario, Canada, upon all corporations engaged in mineral extraction activity in Ontario. In 1968, the tax was calculated by using a graduated percentage of total profits, The Mining Tax Act, Ont.Rev.Stat., ch. 242, § 3(1) (1960), and in 1969 and 1970 the tax was 15 percent of the total profits of the mine in excess of $50,000. The Mining Tax Act, Ont.Rev.Stat., ch. 242, § 3(1) (1960), *amended by*, Ont.Rev.Stat., ch. 69, § 2 (1969); The Mining Tax Act, Ont.Rev.Stat., ch. 275, § 3(1) (1970). In all three years, the relevant Canadian statute permitted the assessment of profits in one of three ways:

(a) the amount of the gross receipts from the output of the mine during the taxation year; or

(b) in case the ore, mineral or mineral-bearing substance or a part thereof is not sold but is treated by or for the owner, holder, lessee, tenant, occupier or operator of the mine, the amount of the actual market value of the output at the pit's mouth; or

(c) if there is no means of ascertaining the actual market value of the output at the pit's mouth, the amount at which the mine assessor appraises such output.

The Mining Tax Act, Ont.Rev.Stat., ch. 242, § 3(3) (1960); The Mining Tax Act, Ont. Rev.Stat., ch. 275, § 3(3) (1970).

Using the first method, profits under the Mining Tax Act are calculated on the basis of gross receipts realized from the sale of produced minerals. Although the second method for calculating profits appears to permit imposition of the Ontario Mining Tax prior to realization of income, defendant now agrees that, in practice, the tax was only imposed on realized income.[4] If the minerals were subjected to processing before sale, the third method was utilized. Under the third method for assessing profits, the value of the unprocessed ore at the mine pit's mouth was calculated by the mine assessor as gross receipts from the sale of processed ore less a processing allowance to reflect the processing profits. Ont.Rev.Regs. 126/75, § 4 (1975). Thus, income attributable to processing profits was excluded from the tax base of the Ontario Mining Tax.[5]

For the years 1968, 1969 and 1970, the processing allowance for Ecstall was calculated as the greater of: (1) 15 percent of income before processing allowance, or (2) 8 percent of processing assets at the end of previous taxation year, limited to 65 percent of income before the processing allowance.[6]

The calculation of the processing allowance, as set out in the 1975 Revised Regulations of Ontario, varied with the type of processing assets a corporation owned or operated. A corporation, like Ecstall, which owned and operated a concentrator, but did not operate a smelter or refinery, was entitled to a processing allowance of 8 percent of its processing assets, whereas a corporation which operated a concentrator and smelter, but did not operate a refinery was entitled to processing allowance of 16 percent of its processing assets. Ont.Rev. Regs. 126/75 § 5 (1975). Thus, the method of computing the processing allowance reflected the amount of processing a corporation undertook. For all corporations, the processing allowance was not to be less than 15 percent, nor more than 65 percent of the combined profit. *Id.* Dr. Thomas P. Mohide, a Canadian mine assessor from 1973 through 1978, stated in his deposition

---

**4.** Although the defendant initially disagreed with this fact, in its response to this court's Order dated December 23, 1989, it became clear that the defendant now agrees that, in practice, the second method was only applied to or imposed on actual realized income.

**5.** Although the processing allowance was not adopted as part of the Revised Regulations of

Ontario until 1975, according to the deposition testimony of Dr. Thomas P. Mohide, a mine assessor from 1973 until 1978, the processing allowance and the means of calculating it were explicitly set out on the Ontario Mining tax return and used in practice.

**6.** As indicated in the 1968 Ontario Mining Tax return of Ecstall.

that the number of corporations which would claim the processing allowance in a given year was small compared to the total number of Ontario Mining Tax returns filed. He estimated that of 50 Mining Tax returns filed in a given year, no more than 15 taxpayers would claim the processing allowance. Moreover, Dr. Mohide stated that all corporations operating mines which had processing assets in Ontario, and which paid the Ontario Mining Tax, were entitled to deduct the processing allowance from their gross revenue, regardless of whether they processed the ore themselves.

Ecstall claimed, in Canadian Dollars, $10,068,565, $8,371,138 and $8,262,800 in processing allowances for 1968, 1969 and 1970, respectively.[7] Although the process-ing allowance was permitted as a deduction from the tax base of the Ontario Mining Tax, several expenses which are allowed as deductions on United States income tax returns are not permitted as deductions in computing the tax base for the Ontario Mining Tax.[8] In all three years at issue in the instant action, no deduction from the Ontario Mining taxes paid by the plaintiff was allowed for expenses associated with interest, royalties and depletion.

According to the plaintiff's exhibit BB referred to in the proposed stipulation of facts filed on March 14, 1985,[9] the amount of the disallowed deductions allowed to plaintiff (in Canadian Dollars) for 1968, 1969 and 1970 were:

|  | Royalties | Interest | Depletion | Other | Total |
|---|---|---|---|---|---|
| 1968 | $3,249,807 | — | $2,943 | $ 6,149 | $3,258,899 |
| 1969 | $2,959,220 | $ 652 | $3,040 | $37,833 | $3,000,745 |
| 1970 | $5,425,926 | $146,951 | $3,131 | $ 3,707 | $5,579,715. |

Section 901 of the Internal Revenue Code,[10] allows a taxpayer to credit the amount of any income taxes paid to a foreign country against its United States in-come tax return, on the condition that the amount to be credited is not in excess of the maximum credit allowable under 26

7. The exchange rate claimed for 1968 and 1969 was .925 and for 1970 the exchange rate claimed was .9316. These exchange rates appear in the United States federal income tax return of Texas Gulf Sulphur Company for the taxable years 1968, 1969 and 1970. Using these exchange rates, the processing allowance claimed by Ec-stall in United States dollars would be $10,884,-935, $9,049,878 and $8,869,472, for 1968, 1969 and 1970, respectively.

8. No allowance of deduction shall be made in respect of,

(a) cost of plant, machinery, equipment or buildings except as provided in subsection 3;
(b) capital invested, or interest or dividend upon capital or stock or investment;
(c) depreciation in the value of the mine, mining land or mining property by reason of exhaustion or partial exhaustion or the ore or mineral;
(d) royalties paid for or in respect of the output of a mine situated on lands not the property of the Crown; and
(e) cost of development of the mine for taxa-tion under this Act before the commencement of output therefrom.

The Mining Tax Act, Ont.Rev.Stat., ch. 242, § 3(4) (1960); The Mining Tax Act, Ont.Rev. Stat., ch. 275 § 3(5) (1970).

9. In his affidavit, filed on March 14, 1985 in support of plaintiff's motion for leave to supple-ment its cross-motion for partial summary judgement, James A. Campbell, Vice President, Taxes, of Texasgulf, Inc., swore to the truth of the facts set forth in the proposed stipulation of facts attached to the supplemental motion. Paragraph 42 of this filing states,

[a]ttached hereto as Exhibit BB is a schedule setting forth for the period 1965 through 1981 (a) the processing allowance allowed to Ec-stall in computing profit for Ontario Mining Tax purposes and (b) the amounts of taxes, interest, cost depletion, royalties and explora-tion and development expenditures not al-lowed as deductions to Ecstall in computing profit for Ontario Mining Tax purposes.

The chart attached to the proposed Stipulation of Facts, although in part difficult to read, ap-pears to be a copy of Exhibit BB submitted on January 2, 1985, in plaintiff's pre-trial submis-sion. The pre-trial submission was ordered by Judge Gibson to be "furnished" by the plaintiff to the Judge and defendant's counsel on or before July 16, 1984. The values for royalties and interest on Exhibit BB appear to be taken from the Canadian federal income tax returns for Ecstall for the calendar years 1968, 1969 and 1970.

10. *See supra* note 3.

U.S.C. § 904(a) (1982).[11]

If, in a given year, the amount of income tax paid to a foreign country exceeds the limitation on credit under 26 U.S.C. § 904(a), a taxpayer may carry back the foreign tax credit, pursuant to 26 U.S.C. § 904(c) (1982),[12] to a year in which the amount of foreign tax credit claimed did not exceed the section 904(a) limitation. In 1983, the Internal Revenue Service adopted Treasury Regulation section 1.901–2, Treas.Reg. § 1.901–2 (1984), which defines income tax for purposes of the foreign tax credit.

On December 12, 1987, plaintiff alleges to have made an election to apply Treasury Regulation section 1.901–2.[13] Texasgulf, therefore, seeks foreign tax credit on its United States federal income tax return for taxes paid under the Ontario Mining Tax.

In *Bank of America National Trust and Savings Association v. United States,* 459 F.2d 513, 198 Ct.Cl. 263 (1972), the Court of Claims held that "a direct income tax is creditable, even though imposed on gross income, if it is highly likely, or was reasonably intended, always to reach some net gain in the normal circumstances in which it applies—otherwise the gross income tax is not creditable." *Id.* at 519–20, 198 Ct.Cl. at 275. In addition, the court stated that the form or name of the tax in the foreign country is not determinative of whether the foreign tax is an income tax recognized under the United States tax law. *Id.* at 519, 198 Ct.Cl. at 274.

In *Inland Steel Co. v. United States,* 677 F.2d 72, 230 Ct.Cl. 314 (1982), the plaintiff had paid taxes on its mining operation in Canada under the Ontario Mining Tax Act, Ont.Rev.Stat., ch. 242 (1960), and claimed foreign tax credit on its consolidated United States federal income tax return for the taxes paid pursuant to the Ontario Mining Tax. 677 F.2d at 79, 230 Ct.Cl. at 324. In *Inland Steel Co.,* the Court of Claims restated the test it enunciated in *Bank of America National Trust and Savings Association:*

> [T]he term 'income tax' in § 901(b)(1) covers all foreign income taxes designed to fall on some net gain or profit, and includes a gross income tax if, but only if, that impost is almost sure, or very likely, to reach some net gain because

---

**11.** (a) *Limitation*

> The total amount of the credit taken under section 901(a) shall not exceed the same proportion of the tax against which such credit is taken which the taxpayers taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year. For purposes of the preceding sentence, in the case of an individual the entire taxable income shall be reduced by an amount equal to the zero bracket amount.

26 U.S.C. § 904(a) (1982).

**12.** (c) *Carryback and carryover of excess tax paid.*

> Any amount by which all taxes paid or accrued to foreign countries or possession of the United States for any taxable year for which the taxpayer chooses to have the benefits of this subpart exceed the limitation under subsection (a) shall be deemed taxes paid or accrued to foreign countries or possessions of the United States in the second preceding taxable year, in the first preceding taxable year, and in the first, second, third, fourth, or fifth succeeding taxable years, in that order and to the extent not deemed taxes paid or accrued in a prior taxable year, in the amount by which the limitation under subsection (a) for

such preceding or succeeding taxable year exceeds the sum of the taxes paid or accrued to foreign countries or possessions of the United States for such preceding or succeeding taxable year and the amount of the taxes for any taxable year than earlier the current taxable year which shall be deemed to have been paid or accrued in such preceding or subsequent taxable year (whether or not the taxpayer chooses to have the benefits of this subpart with respect to such earlier taxable year). Such amount deemed paid or accrued in any year may be availed of only as a tax credit and not as a deduction and only if the taxpayer for such year chooses to have the benefits of this subpart as to taxes paid or accrued for that year to foreign countries or possessions of the United States.

26 U.S.C. § 904(c) (1982).

**13.** A taxpayer may elect to apply Treasury Regulation section 1.901–2 to taxable years prior to the effective date of the regulation. The proper manner for making an election is to attach a statement indicating that the election is made and the countries to which it applies to a "return, amended return or claim for refund for the earliest taxable year to which the earliest election relates." Treas.Reg. § 1.901–2(h) (1984).

costs or expenses will not be so high as to offset the net profit.

*Id.* at 80, 230 Ct.Cl. at 326 (quoting *Bank of America Nat'l Trust & Sav. Ass'n v. United States*, 459 F.2d at 523, 198 Ct.Cl. at 281). Applying this principle, the court in *Inland Steel Co.*, held that the Ontario Mining tax, the tax at issue in this case, is not "sure, or very likely" to reach net gain due to the omission of "significant costs of the mining business" as allowable deductions under the Ontario Mining Tax.[14] Plaintiff, however, argues that *Inland Steel Co.*, was decided prior to the adoption of Treasury Regulation section 1.901–2 and that this regulation allows a taxpayer to meet the net gain requirement in a way which was not discussed *Inland Steel Co. See* Treas.Reg. § 1.901–2(b)(4) (1984).

In order to fully understand how a taxpayer can satisfy the net gain requirement under the Treasury Regulations, the appropriate starting point is that portion of the Treasury Regulations which defines income tax for purposes of foreign tax credit. Treasury Regulation section 1.901–2 states that: a foreign levy is an income tax if and only if it is a tax and the predominate character is an income tax in the United States sense. Treas.Reg. § 1.901–2(a) (1984).

Prior to the adoption of Treasury Regulation section 1.901–2, in order for income tax paid to a foreign country to be credited against a corporation's United States income tax liability, the tax must have been the substantial equivalent of an "income tax," as the term is defined in this country. *Biddle v. Commissioner*, 302 U.S. 573, 58 S.Ct. 379, 82 L.Ed. 431 (1938); *Bank of America Nat'l Trust & Sav. Ass'n v. United States*, 459 F.2d 513, 198 Ct.Cl. 263 (1972). The section of the Treasury Regulation quoted above indicates that the regulations embody the long standing principle that the characterization of a foreign tax for foreign tax credit is made by applying the standards of United States tax law, as

opposed to applying the law of the foreign country levying the tax.

The preliminary determination of whether a foreign levy is a "tax," one of the requirements for the foreign levy to be characterized as an income tax, is also decided under United States principles. If a foreign levy requires a "compulsory payment pursuant to the authority of a foreign country to levy taxes," it can be considered a tax under United States principles. Treas.Reg. § 1.901–2(a)(2)(i) (1984). The Ontario Mining Tax is levied by Canada through the Department of Mines and imposed on corporations which extract minerals. According to the Treasury Regulation at issue, a foreign levy is not a tax "to the extent a person subject to the levy receives (or will receive), directly or indirectly, a specific economic benefit." *Id.* § 1.901–2(a)(2)(i). One example of a specific economic benefit given in the regulations is the right to "extract resources, patents or other property that a foreign country owns or controls." *Id.* § 1.901–2(a)(2)(ii)(B). Although the Ontario Mining Tax is arguably levied in exchange for the right to extract minerals, Canada does not have "control of the property" owned by the plaintiff, the Kidd Creek Mine, within the meaning set forth in Treasury Regulation section 1.901–2(a)(2)(ii)(D).[15] Therefore, notwithstanding the fact that Ecstall extracts minerals from Canada, the Ontario Mining Tax can be considered a tax within the definition set out in the United States Treasury Regulations.

The predominant character of a foreign tax is an income tax under the regulations as promulgated, if the tax is "likely to reach net gain in the normal circumstances in which it applies." *Id.* § 1.901–2(a)(3)(i). This requirement embodies the language of the Court of Claims first enunciated in *Bank of America National Trust and Savings Association v. United States*, 459

---

**14.** *See supra* note 8.

**15.** A foreign country controls property that it does not own if the country exhibits substantial indicia of ownership with respect to the property, for example, by both regulating the

quantity of property that may be extracted and establishing the minimum price at which it may be disposed of.
Treas.Reg. § 1.901–2(a)(2)(ii)(D) (1984).

F.2d 513, 198 Ct.Cl. 263 (1972). Noting that the purpose of the foreign tax credit under section 901 of the Internal Revenue Code is to avoid double taxation of income, the court, in *Bank of America National Trust and Savings Association v. United States,* held that a tax on gross income is creditable "if it is very highly likely, or was reasonably intended, always to reach some net gain in the normal circumstances in which it applies—otherwise the gross income tax is not creditable." *Id.* at 523, 198 Ct.Cl. at 275. Under the applicable Treasury Regulations, a foreign tax is likely to reach net gain in the normal circumstances in which it applies if three independent requirements, the realization, gross receipts, and net income requirements, discussed above are met. The only requirement in dispute in the instant action is the net income requirement which was a key issue in *Inland Steel Co. v. United States, Bank of America National Trust and Savings Association v. United States,* and *Bank of America National Trust and Savings Association v. Commissioner.*

First, the realization requirement of section 1.901–2 of the United States Treasury Regulations can be satisfied in several ways. The realization requirement can be fulfilled if the foreign tax is imposed "[u]pon or subsequent to the occurrence of events ("realization events") that would result in the realization of income." Treas. Reg. § 1.901–2(b)(2)(i)(A) (1984). The plaintiff claims, and the defendant concedes, that in practice the Ontario Mining Tax was only imposed on realized income, although the language of the Ontario Mining Tax suggests otherwise. Profits, for purposes of computing the Ontario Mining Tax, in all three years were calculated in one of several ways as follows:

1) the amount of gross receipts from the output of the mine during the taxation year; or

2) in case the ore, mineral or mineral-bearing substance or a part thereof is not sold but is treated by or for the owner, holder, lessee, tenant, occupier or operator of the mine, the amount of the actual market value of the output at the pit's mouth; or

3) if there is no means of ascertaining the actual market value of the output at the pit's mouth, the amount at which the mine assessor appraises such output.

The Mining Tax Act, Ont.Rev.Stat., ch. 242, § 3(3) (1960); The Mining Tax Act, Ont. Rev.Stat., ch. 275 § 3(3) (1970). If profits in computing the Ontario Mining Tax are calculated by the first of these methods, the Ontario Mining Tax is imposed subsequent to realization events, *e.g.,* sales of the unprocessed ore, and the Ontario Mining Tax satisfies the realization requirement. The second method, described in the Ontario Mining Tax was utilized in practice, for gold and gypsum. If the third method described in the Ontario Mining Tax was used, the value at the mine pit's mouth was calculated by the mine assessor as gross receipts from the sale of processed ore, less a processing allowance. Therefore, the third method of computation was also based on realized income.

The gross receipts requirement of section 1.901–2 of the United States Treasury Regulations is met if the tax is imposed on the basis of: gross receipts; or gross receipts computed under a method that is likely to produce an amount that is not greater than fair market value. Treas. Reg. § 1.901–2(b)(3) (1984). To determine whether the Ontario Mining Tax satisfies the gross receipts requirement, the court applies the three methods quoted above for calculating the tax base or profits under the Ontario Mining Tax.

The first method for computing the Ontario Mining Tax satisfies the gross receipts requirement of the section 1.901–2 because the tax base is computed directly from the amount of gross receipts from sales of the unprocessed ore. The second method, described in the Ontario Mining Tax, although apparently not used in the instant taxpayer's case, fulfills the gross receipts requirement of the section 1.901–2 because the computation is intended to reach actual market value and, therefore, is not likely to exceed market value. Finally, the third method for computing the Ontario Mining Tax base fulfills the gross receipts requirement of the section 1.901–2 because

the mine assessor's appraisal is computed from gross receipts, less a processing allowance.

A foreign tax satisfies the net income requirement of section 1.901–2 of the United States Treasury Regulations if the base of the tax is computed by reducing gross receipts to permit either:

(A) recovery of the significant costs and expenses (including significant capitol expenditures) attributable, under reasonable principles, to such gross receipts; or

(B) recovery of such significant costs and expenses computed under a method that is likely to produce an amount that approximates, or is greater than, recovery of such significant costs or expenses.

*Id.* § 1.901–2(b)(4)(A) and (B).

■ In the instant case, the plaintiff alleges that facts pertaining to the issues of whether the disallowed deductions under the Ontario Mining Tax are "significant" and whether the processing allowance "effectively compensates" for the disallowed deductions are in dispute. Moreover, the plaintiff contends that these facts are material because they are determinative of whether the Ontario Mining Tax satisfies the net income requirement under United States Treasury Regulation section 1.901–2. Therefore, the plaintiff argues that this court should deny the defendant's motion for partial summary judgment.

With respect to the first, alleged factual issue in dispute, whether the disallowed deductions under the Ontario Mining Tax are "significant" as set forth in Treasury Regulation section 1.901–2, the law is clear. In accordance with the decision in *Inland Steel Co.*, this court finds that the deductions which are disallowed under the Ontario Mining Tax, including interest, depletion and royalties, are "significant." *Inland Steel Co. v. United States*, 677 F.2d 72, 230 Ct.Cl. 314 (1982).

Pursuant to subsection (A) of Treasury Regulation section 1.901–2(b)(4)(i) the plaintiff contends that the disallowed deductions under the Ontario Mining Tax are not "significant." In its supplemental brief filed July 31, 1985, the plaintiff argues that "while defendant's position, that the Ontar-io Mining Tax does not reach net gain, may have been correct under cases such as *Inland Steel Co. v. United States*, the present standard for deciding credibility should be taken from Private Letter Ruling 85–25–122 because it reflects the defendant's interpretation of its own regulations. Private Letter Ruling 85–25–122 held that amounts payable to the Canadian federal government for the Production Revenue Tax under the Petroleum and Gas Revenue Tax Act are creditable income taxes, although the Production Revenue Tax allows no deductions for such costs and expenses as interest, depletion and exploration expenses because the disallowed costs were effectively compensated for by the allowance of a resource allowance of 25 percent of production revenue. Priv.Ltr.Rul. 85–25–122 (March 28, 1985).

■ While it is true that private letter rulings reveal the agency's interpretation of statutes (and regulations promulgated pursuant to those statutes) it is charged with the responsibility of administering, *Deluxe Check Printers, Inc. v. United States*, 14 Cl.Ct. 782, 792 (1988) (quoting *Hanover Bank v. Commissioner*, 369 U.S. 672, 686, 82 S.Ct. 1080, 1088, 8 L.Ed.2d 187 (1962)), and that a reviewing court should accord substantial weight to an agency's interpretations of its own statutes (and regulations), *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986), private letter rulings of the Internal Revenue Service, although instructive, have no precedential force and are not controlling authority, binding upon this court. *Xerox v. United States*, 656 F.2d 659, 660 n. 3, 228 Ct.Cl. 406, 408 n. 2 (1981). Moreover, "even though a taxpayer receiving a private ruling issued by the ... Internal Revenue Service might be entitled to rely upon it until revoked, no court has held a private ruling binding on the government as against other taxpayers." *Shakespeare Co. v. United States*, 389 F.2d 772, 777, 182 Ct.Cl. 119, 128 (1968) (citations omitted). In the instant case, the private letter ruling cited by the plaintiff concerned not only a different taxpayer, but interpreted a different foreign tax code provision, applicable to

oil and gas revenues. Contrary to plaintiff's understanding derived from an application by analogy of Private Letter Ruling 85–25–122, it is this court's determination, as is discussed more fully below, that the processing allowance permitted by the Ontario Mining Tax does not effectively compensate for the disallowed deductions of the Ontario Mining Tax.

Although *Inland Steel Co.*, concerned a determination of whether the Ontario Mining Tax is an income tax in the United States "sense" and was issued prior to the promulgation of Treasury Regulation section 1.901–2, the reasoning and, therefore, holding in *Inland Steel Co.*, contrary to the plaintiff's argument, does apply in the instant case. Since the drafters of Treasury Regulation section 1.901–2 intended to adopt the standard of *Inland Steel Co.*, the use of the word "significant" in section 1.901–2(b)(4)(i)(A) was intended to reflect the holding of that case. In *Inland Steel Co.*, the court held that "[i]n view of the large-scale omission from the [Ontario Mining Tax] of significant costs of the mining business [*e.g.*, land expenses, rent, private royalties, interest, depletion], it cannot be said that the net gain of that business is sure, or very likely to be reached by that tax." *Inland Steel Co. v. United States*, 677 F.2d at 85, 230 Ct.Cl. at 334. The instant case concerns the same Ontario Mining Tax levy and the same disallowed deductions, which include interest, depletion, and royalties. In accordance with *Inland Steel Co.*, this court finds, that the disallowed deductions in the instant action are "significant" and that the Ontario Mining Tax is not likely to reach net gain, as described in subsection (A) of Treasury Regulation section 1.901–2(b)(4)(i).[16]

In addition to its argument based on subsection (A) of section 1.901–2(b)(4)(i), the plaintiff contends that the Ontario Mining Tax meets the alternative net income requirement set forth in Treasury Regulation section 1.901–2(b)(4)(i)(B). According to subsection (B) of Treasury Regulation

§ 1.901–2(b)(4)(i), if the processing allowance does "effectively compensate" for the significant disallowed deductions, then the Ontario Mining Tax would be likely to reach net gain in the normal circumstances in which it applies. Treasury Regulation section 1.901–2(b)(4)(i) states that:

A foreign tax law that does not permit recovery of one or more significant costs or expenses, but that provides allowances that effectively compensate for nonrecovery of such significant costs or expenses, is considered to permit recovery of such costs or expenses. Principles used in the foreign tax law to attribute costs and expenses to gross receipts may be reasonable even if they differ from principles that apply under the Internal Revenue Code....

Treas.Reg. § 1.901–2(b)(4)(i) (1984).

The plaintiff claims that because the processing allowance of the Ontario Mining Tax did, in fact, "effectively compensate" for the disallowed deductions, the Ontario Mining Tax is an income tax in the United States sense and is creditable. In order to determine if the processing allowance did "effectively compensate" for the disallowed deductions, the particular facts set forth by the plaintiff and the defendant, as well as the evidentiary burden the plaintiff must bear at trial, must be examined as prescribed in *Anderson v. Liberty Lobby Co., Celotex Corp. v. Catrett*, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, discussed above.

█ In a tax refund case, there is a strong presumption of the correctness of the findings of the Commissioner of Internal Revenue. The taxpayer has the burden of rebutting that presumption. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Young & Rubicam, Inc. v. United States*, 410 F.2d 1233, 1244, 187 Ct.Cl. 635, 655, (1969); *Jupiter Corp. v. United States*, 2 Cl.Ct. 58, 61 (1983). In order to overcome this presumption, plaintiff has the burden of presenting "substan-

---

**16.** Although the 1969 amendment to the Mining Tax Act added a new deduction to the list of allowed deductions, a deduction for the cost of developing the mine, and this deduction was not

considered in *Inland Steel Co.*, the addition is not a basis for distinguishing *Inland Steel Co.* from the present case and making it inapplicable.

tial evidence as to the wrongfulness of the Commissioner's determination." *KFOX v. United States*, 510 F.2d 1365, 1369, 206 Ct.Cl. 143, 151–52 (1975). Once the taxpayer has met this burden the presumption in favor of the defendant is shifted and the court must resolve the question presented upon the basis of all the evidence before it. *Id.*, 510 F.2d 1365, 206 Ct.Cl. at 152 (citing *Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935)). Therefore, if this case were to go to trial, the plaintiff would have the burden of proving, by substantial evidence, that the findings of the Commissioner of Internal Revenue were incorrect. Applying the test for determining whether summary judgment is appropriate in a particular case, *see supra* pp. 5–8, the inquiry in this tax refund case is whether the evidence presented by the plaintiff at this stage in the proceedings, is such that the court, as the fact finder, could reasonably find that, at trial, the plaintiff would be able to overcome by substantial evidence, the presumption of correctness of the Commissioner's assessment of taxes.

In the instant case, in 1981, the Commissioner of Internal Revenue denied, among other items, the refund for the foreign tax credit Texasgulf now seeks. As noted above, at trial, the plaintiff would bear the burden of overcoming the strong presumption in favor of the correctness of the findings made by the Commissioner of the Internal Revenue Service.

In 1968, 1969 and 1970, Ecstall claimed $10,068,565, $8,371,138 and $8,262,800, respectively, in processing allowance on its Ontario Mining Tax return. Submissions by the plaintiff also indicate that the amounts, in Canadian Dollars, of the disallowed deductions for Ecstall for the years 1968, 1969 and 1970 were:

|      | Royalties    | Interest  | Depletion | Other    | Total [17]    |
|------|--------------|-----------|-----------|----------|---------------|
| 1968 | $3,249,807   | —         | $2,943    | $ 6,149  | $3,258,899    |
| 1969 | $2,959,220   | $    652  | $3,040    | $37,833  | $3,000,745    |
| 1970 | $5,425,926   | $146,951  | $3,131    | $ 3,707  | $5,579,715.   |

The values set forth in the above chart, appear to have been taken from the deductions Ecstall claimed in its Canadian income tax returns. Although it was not required to pay any Canadian income tax for those years, due to a provision of Canadian law which allows a corporation to exclude income derived from the operation of the mine during the first three years of operation, Ecstall filed a Canadian income tax return in 1968, 1969 and 1970. Plaintiff submitted copies of these Canadian income tax returns in its pre-trial submission to this court. The values for royalties and interest listed in exhibit BB are the same as those shown in the Canadian income tax returns for Ecstall for the years 1968, 1969 and 1970. Thus, the values for the disallowed deductions, which the plaintiff claims were "effectively compensated" for by the processing allowance of the Ontario Mining Tax, apparently, are the amounts for these deductions shown on the plaintiff's Canadian income tax returns. Accepting these values shown for the various deductions as true, the court finds that these values are immaterial to the issue in dispute, whether the Ontario Mining Tax is an income tax as recognized by United States tax law. As discussed earlier, for a tax paid to a foreign country to be creditable to tax accounts paid to the United States, "the foreign tax must be the substantial equivalent of an income tax as that term is understood in the United States." *Inland Steel Co. v. United States*, 677 F.2d at 79, 230 Ct.Cl. at

17. The values in this chart were taken from exhibit BB of plaintiff's pre-trial submission entitled "Comparison of Processing Allowance to Disallowed Expenses" for the years 1965 through 1981. James A. Campbell, Vice President, Taxes, of Texasgulf, Inc., swore to the truth of the facts in the proposed stipulation of facts filed March 14, 1985, which included a copy of exhibit BB. Since on a motion for summary judgment all evidence must be viewed in the light most favorable to the non-moving party, the court accepts the values set forth in the "Comparison of Processing Allowance to Disallowed Expenses" as true for the purposes of deciding this motion, *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

325 (relying on *Biddle v. Commissioner,* 302 U.S. 573, 58 S.Ct. 379, 82 L.Ed. 431 (1938)). Therefore, in order to demonstrate that the processing allowance effectively compensates for the disallowed deductions, the plaintiff would have to compare the processing allowance for the years in question to the values for the disallowed deductions as they would be calculated in the

United States, as opposed to the values for the disallowed deductions as they were calculated under the Canadian federal income tax laws.

On its United States federal income tax returns, submitted to the court in its pre-trial submissions, the plaintiff claimed the following amounts (in United States Dollars) as deductions on behalf of Ecstall:

|      | Royalties   | Interest   | Depletion    | Total         |
|------|-------------|------------|--------------|---------------|
| 1968 | $3,018,500  | $ 7,035    | $12,862,406  | $15,880,913   |
| 1969 | $2,747,247  | $ 607      | $12,504,266  | $15,252,120   |
| 1970 | $5,203,018  | $144,195   | $12,930,507  | $18,277,720.  |

If the total of these deductions in United States Dollars were converted to Canadian Dollars the amounts would be even larger than the totals indicated above.

Comparison of the dollar amounts of the processing allowance for Texasgulf with the dollar amounts of the disallowed deductions claimed for Ecstall on its United States income tax return for 1968, 1969 and 1970 suggests that the processing allowance did not "effectively compensate" for the disallowed deductions. In 1968, 1969 and 1970, Ecstall claimed $10,068,565, $8,371,138 and $8,262,800, respectively, in processing allowances on its Ontario Mining Tax return. Of the three years at issue the processing allowance claimed by Texasgulf was greatest in 1968. The amount of the processing allowance in 1968, $10,068,-565 in Canadian Dollars, is equal to $9,313,-423 in United States Dollars.[18] The depletion allowance alone, claimed by Texasgulf on behalf of Ecstall in its United States federal income tax return, in excess $12,-000,000 for 1968, 1969 and 1970, is more than $3,000,000 greater than the processing allowance in all three years. Clearly, if the United States income tax returns reflect the amount of the disallowed deductions, the processing allowance did not compensate for the disallowed deductions in the applicable years.

### Conclusion

Although the plaintiff argues otherwise, the principle holding of *Inland Steel Co.,*

that the Ontario Mining Tax, also at issue in this case, is not an income tax in the United States sense, for purposes of creditability on the plaintiff's United States income tax return pursuant to 26 U.S.C. § 901 as an income tax paid to a foreign country, has not been altered by the promulgation of Treasury Regulation section 1.901–2. The court rejects the plaintiff's contentions that the promulgation of Treasury Regulation section 1.901–2 altered the law set forth in *Inland Steel Co.,* or that there are genuine issues of material facts in dispute in this case. The defendant's Motion for Partial Summary Judgment is, therefore, GRANTED.

IT IS SO ORDERED.

---

**18.** The conversion rate of .925 was taken from the United States federal income tax return of

Texas Gulf Sulphur Company for the taxable year ended December 31, 1968.