### NEW YORK & HONDURAS ROSARIO MIN. CO. v. COMMISSIONER OF INTERNAL REVENUE.

#### No. 250, Docket 20894.

Circuit Court of Appeals, Second Circuit.

June 1, 1948.

---

[8] In re Engineers Public Service Co., 3 Cir., 1948, 168 F.2d 722.

[9] See In re Engineers Public Service Co., 3 Cir., 1948, 168 F.2d 722.

Reeves, Todd, Ely & Beaty, of New York City (Julian B. Beaty, David Cohen, and Francis D. Murray, all of New York City, of counsel), for petitioner.

Theron Lamar Caudle, Asst. Atty. Gen., and Sewall Key, A. F. Prescott, and S. Dee Hanson, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

The petitioner is a New York corporation engaged in gold and silver mining operations in the Republic of Honduras. During the taxable years in suit it paid taxes to the Honduras Government which it contends were "income taxes" entitling it to credits against its United States income taxes for the same years by virtue of section 131(a) (1) of the Internal Revenue Code, printed in the margin.[1] The Tax Court's disallowance of the credits, 8 T.C. 1232, resulted in the deficiencies before us for review.

Mining operations in Honduras are regulated by a comprehensive mining Code, namely, Decree No. 64 of February 15, 1937 as amended by Decree No. 3 of December 11, 1939. Article 221 of this Code requires all "mining enterprises" to "pay to the State at least five per cent of the liquid profits of the exploitation, said percentage to be fixed by contract with the executive power with the special approval by the national congress." Pursuant to this provision the petitioner made a contract with Honduras, approved by the National Congress by Decree No. 67 of February 13, 1940, which fixed the rate of tax at 7 per cent. for the years in suit. The contract was to cover a twenty year period ending December 31, 1960, and the company agreed to, and did, advance to the Honduran Government

[1] 26 U.S C.A.Int.Rev.Code, § 131: "Taxes of foreign countries and possessions of the United States. (a) Allowance of credit. If the taxpayer chooses to have the benefits of this section, the tax imposed by this chapter * * * shall be credited with:

(1) Citizens and domestic corporations. In the case of * * * a domestic corporation, the amount of any income * * * taxes paid or accrued during the taxable year to any foreign country * * * "

$250,000, against which should be charged future "income tax" assessments.[2] Of the $250,000 so deposited, Honduras applied $21,120.27 in payment of the 7% tax for 1941 and $32,724.47 in payment of the 7% tax for 1942. The Tax Court held that such payments were not "income taxes" paid to a foreign country but were privilege taxes, which were deductible from gross income as a business expense but were not entitled to be credited against United States taxes under § 131 of the Internal Revenue Code. The correctness of that ruling is the sole question before us.

■■■■ The provision for credit of foreign income taxes first appeared in section 238 of the Revenue Act of 1918, 40 Stat. 1080. As explained in Burnet v. Chicago Portrait Company, 285 U.S. 1, at page 7, 52 S.Ct. 275, 277, 76 L.Ed. 587, the purpose of the provision was to "mitigate the evil of double taxation" of domestic corporations on income derived from foreign sources. In the application of section 131 the criteria prescribed by our own revenue laws and court decisions control the meaning of the words "income taxes" as used therein. Biddle v. Commissioner, 302 U.S. 573, 578, 579, 58 S.Ct. 379, 82 L.Ed. 431; Keasbey & Mattison Co. v. Rothensies, 3 Cir., 133 F.2d 894, 897, certiorari denied 320 U.S. 739, 64 S.Ct. 39, 88 L.Ed. 438. Hence the ultimate question for determination is whether the foreign tax is the substantial equivalent of an "income tax" as that term is understood in the United States.

The Tax Court was of opinion that the taxes in question were payments for the privilege of exploiting the particular mining properties which the petitioner operated. We do not agree. Chapter XII of Decree No. 64 (which we refer to as the Mining Code) is entitled "Grant and Forfeiture of the Ownership of Mines." Articles 149 and 150 of Chapter XII apparently impose two excise taxes: one upon the exploitation of mines, the other upon "reduction works," which we understand to mean smelters.[3] Failure to pay these taxes results in forfeiture of the privileges (Article 151), as does also "failure of constant work and exploitation" (Article 154). Article 221 under which the taxes in suit were paid appears in Chapter XVI entitled "Rights and Obligations of the Miners in General." This Article, requiring a mining enterprise to pay to the Government a percentage of its liquid profits, was first enacted in 1937.[4] It was amended in 1939 to read as follows:

"Article 221. The mining enterprises shall pay to the State at least five per cent of the liquid profits of the exploitation, said percentage to be fixed by contract with the executive power with the special approval by the national congress.—The executive

---

[2] The second paragraph of the contract provided:

"2nd—The Contractor obligates itself to deliver to the General Treasury of the Republic of Honduras * * * the sum of two hundred and fifty thousand dollars ($250,000) in currency of the United States of America * * * Said sum, advanced without interest, shall be on account of the income tax of seven per cent upon the liquid profits of the exploitation of the mines which it is now operating at Nuevo Rosario * * *; it being understood that the seven per cent shall be applied only upon the profits of Nuevo Rosario which the Contractor is exploiting at the present time, but that on liquid profits of the other mining properties which it may exploit in the Republic, it shall pay to the Government five per cent only during the first ten years of exploitation, and that for the subsequent years the Contractor will pay such maximum percentage above five per cent as by mutual agreement the parties here-

to shall determine in the contracts they may execute for the purpose of this exploitation."

[3] "Article 149.—The owners of mining zones and mining claims shall pay a yearly tax of one lempira per hectare; and when a mine has been constituted in a zone, its exploitation and operation shall be carried out according to the provisions of the following article."

"Article 150.—The grants for reduction works form a property different from the mining claims and mineral grants, and are divided into three classes." The classes are defined by the process used by the reduction works, and each class pays a "yearly tax" in a different amount per hectare.

[4] As originally enacted it read: "The mining enterprises shall give to the State five per cent of the liquid profits of the exploitation of their mines, and the government shall have the right to examine the books of said enterprises, whenever it deems it convenient."

power may examine the books of accounts of said enterprises, whenever it finds it expedient.—The ministry of finance in its yearly report shall inform the congress as to the examinations made and the amounts received by the State in compliance with this article.

"For the calculation of the liquid earnings, the salaries and personal expenses assigned to the boards of directors of the enterprises shall be excluded."

There is no provision for forfeiture for non-payment of the "liquid profits" tax, thus differentiating this impost from the excise taxes of Articles 149 and 150 heretofore mentioned. Although Article 221 does not define how "liquid earnings" are to be calculated, except to exclude from the calculation "the salaries and personal expenses assigned to the boards of directors," the contract made in 1940 between Honduras and the petitioner, and approved by decree No. 67, was specific on this subject. It provided that "liquid profits * * * shall be calculated in the customary manner, that is to say, the amount received from its exports, less its operating expenses within the country and abroad directly applicable to the management of its mines in Honduras, plus reasonable deductions for amortization and depletion of its property and inventories, with the exception of the disbursements by reason of salaries and personal expenses assigned to the Board of Directors of the enterprises." The contract also provided that "in case of disagreement" between Honduras and the "Contractor" as to the amount of the "liquid profits upon which the tax of seven per cent is levied * * * there shall be taken as such sum that which has been accepted by the government of the United States of America in imposing its tax upon the liquid profits of the mining operations of the Contractor in Honduras." From Article 2nd of the contract, quoted in note 2 supra, it appears that the tax is expressly described as an "income tax."

■ What a tax is called does not determine whether it is an income tax or an excise tax. Flint v. Stone Tracy Co., 220 U.

S. 107, 145, 31 S.Ct. 342, 55 L.Ed. 389, Ann. Cas.1912B, 1312. But we think it not without significance that Honduras in its Mining Code does lay genuine excises, with forfeiture of the mining company's rights for non-payment, and also a tax on "liquid profits," without such forfeiture for non-payment, which is called an "income tax" in the contract approved by the national congress.[5] Moreover, the tax on "liquid profits" is applicable to all miners, not merely to United States companies, and in general characteristics is indistinguishable from our own income tax. It is not laid on value of the minerals mined but on "the amount received from its exports," i. e. gross income, less operating expenses within Honduras and expenses abroad directly applicable to management of the mines, plus reasonable deductions for amortization and depletion. The exclusion of "salaries and personal expenses assigned to the board of directors" is of no significance as applied to United States companies, since in this country directors are not entitled to "salaries" and "personal expenses," although they do receive small fees for attending meetings. Furthermore, in case of disagreement between Honduras and the taxpayer, the "liquid profits" shall be whatever sum the United States taxed as liquid profits; hence it is within the taxpayer's power to make the Honduras tax conform exactly with our income tax.

The foregoing analysis of the Honduran tax differentiates it, in our opinion, from the Quebec mining tax considered in Keasbey & Mattison Co. v. Rothensies, 3 Cir., 133 F.2d 894, certiorari denied 320 U.S. 739, 64 S.Ct. 39, 88 L.Ed. 438, and held not to be an income tax. The tax there in question was not laid upon income as we compute it but upon the "gross value of the year's output" less the costs incurred in the mining operation.

■■ It must be conceded that the Honduran tax differs from our federal income tax in permitting the rate of the tax if more than five per cent of liquid profits was to be collected, to be determined by contract approved by the national congress.

5 See Seatrain Lines, Inc. v. Commissioner, 46 B.T.A. 1076, 1080; Havana Electric Railway Light & Power Co. v. Commissioner, 34 B.T.A. 782, 790.

But we do not see that this changes the character of the tax. If the minimum five per cent rate is an income tax, as we think it is for reasons already stated, the additional two per cent arranged by contract can have no different character. Nor do we think it material that $250,000 was paid down as an advance against which the annual taxes were to be charged off. It is true that if the taxpayer stopped operations, Honduras was not obligated to repay any portion of the advance; but the taxpayer has not stopped operations. In the years 1941 and 1942 the sum advanced stood as a credit to the taxpayer; we are concerned with the debits charged against it in those years. Those debits we hold were payments of incomes taxes to a foreign country. To hold otherwise would defeat the purpose of section 131, which was to encourage domestic corporations to do business abroad without having to operate through a foreign corporation, the inducement being that their income from operations abroad should be taxed only once.[6]

For the foregoing reasons we respectfully disagree with the Tax Court's decision. The order is reversed and the cause remanded for further proceedings in conformity with this opinion.

---

[6] See the Statement of the Acting Secretary of the Treasury to the House Committee on Ways and Means, 73d Cong., 2nd Sess., p. 1 relative to the Revenue Act of 1934.