107 T.C. No. 5

UNITED STATES TAX COURT

TEXASGULF INC. AND SUBSIDIARIES, AS
SUCCESSOR IN INTEREST TO TEXASGULF INC.
AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15528-89.            Filed September 9, 1996.

Under the Ontario Mining Tax (OMT), mine operators
are generally liable for a tax on gross receipts less
deductions for several expenses and a processing
allowance.  P paid the OMT and claimed a foreign tax
credit under sec. 901, I.R.C.

P and R agree that sec. 1.901-2, Income Tax Regs.,
applies to the years at issue.  R concedes that the OMT
is a tax and that it meets realization and gross income
requirements imposed by those regulations but contends
that the OMT does not meet the net income requirement.
Sec. 1.901-2(b)(4), Income Tax Regs.

A foreign tax meets the net income requirement if
it meets any one of three tests.  Under one of those

tests, a foreign tax meets the net income requirement if, judged on the basis of its predominant character, the base of the tax is computed by reducing gross receipts to permit recovery of significant expenses under a method that is likely to approximate or exceed those expenses.  Sec. 1.901-2(b)(4)(i)(B), Income Tax Regs.

Held:  Whether, judged by the predominant character of the OMT, the processing allowance is likely to approximate or exceed expenses related to gross receipts which are nonrecoverable under the OMT is a question of fact.  Accord Texasgulf, Inc. v. United States, 17 Cl. Ct. 275 (1989), modified per order (Apr. 16, 1992).

Held, further, P has proven that, judged on the basis of the predominant character of the OMT, the processing allowance is likely to approximate or exceed expenses related to gross receipts which are nonrecoverable under the OMT.  Inland Steel Co. v. United States, 233 Ct. Cl. 314, 677 F.2d 72 (1982), distinguished (sec. 1.901-2, Income Tax Regs., did not apply).

Willard B. Taylor, Richard J. Urowsky, Michael Lacovara, C. Barr Flinn, Ann T. Kenny, Jared M. Rusman, and Scott L. Lessing, for petitioner.

Lewis R. Mandel, Monica E. Koch, and Christopher W. Shoen, for respondent.

COLVIN, Judge:  Respondent determined deficiencies in petitioner's Federal income tax of $563,127 for 1979, $10,998,770 for 1980, and $1,794,073 for 1981.  The sole issue for decision

is whether the Ontario Mining Tax (OMT) is creditable under section 901.  We hold that it is.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.   Petitioner and Kidd Creek Mine

Petitioner was a Delaware corporation the principal place of business of which was in Stamford, Connecticut, when it filed the petition.

Petitioner is the successor in interest to Texasgulf Inc., a Texas corporation which filed consolidated Federal income tax returns for taxable years 1978, 1979, 1980, and 1981, as the parent of Texasgulf Canada.  Texasgulf Canada discovered the Kidd Creek mineral reserves near Timmins, Ontario, Canada, in 1964.  Texasgulf Canada explored the reserves, acquired some land claims from current owners, and began to develop the reserves.

Texasgulf Canada was incorporated in Delaware in 1965 as Ecstall Mining Ltd. (Ecstall).  In 1966, Texasgulf Canada transferred the Kidd Creek land claims to Ecstall.  At that time, the property had a significant amount of mineral reserves and substantial value.  Ecstall began mining and concentrating operations at Kidd Creek Mine in 1966.  Kidd Creek Mine is an

open pit mine at which ore from a copper, zinc, lead, and silver deposit is produced. In 1966, Kidd Creek Mine had a concentrator which was about 17 miles from the mine. A railroad connected them.

Texasgulf Canada owned and operated the Kidd Creek Mine from 1968 to 1981. From 1968 to 1980, Texasgulf Canada crushed the ore from Kidd Creek Mine into pieces 7½ inches or smaller. Texasgulf Canada then put the ore in storage bins and carried it by rail to the concentrator for further processing. The concentrator further crushed, pulverized, and concentrated the ore.

Ecstall changed its name to Texasgulf Canada Ltd. in 1975 and to Kidd Creek Mines Ltd. in 1981. Texasgulf Canada was subject to the OMT because it mined and processed ore at Kidd Creek Mine. Texasgulf Canada paid OMT of $934,238 for 1978, $12,437,280 for 1979, and $18,307,052 for 1980.

B. The Ontario Mining Industry and the Production of Metal

Many metallic and nonmetallic minerals are mined and produced in Ontario. Metallic minerals mined in Ontario include base metals such as nickel, copper, and zinc, and precious metals such as gold, silver, and platinum. Nonmetallic minerals mined in Ontario include asbestos, peat, gypsum, talc, and salt.

Generally, metal production in Ontario and elsewhere has four phases:  (1) Exploration; (2) development; (3) mining; and (4) processing.

1.   Exploration

The exploration phase consists of finding and delineating ore reserves.  These activities range from prospecting to exploring by aircraft with advanced scientific techniques such as electromagnetic and seismic surveying.  Texasgulf Canada discovered minerals near the Kidd Creek Mine by using airborne exploration techniques.

2.   Development

The development phase includes activities needed to bring a mineral reserve into production.  For an underground mine, development activities include sinking a shaft, adit (an almost horizontal entrance to a mine), or ramp from the surface of the ground into the mineral reserves.  For an open pit mine, such as the Kidd Creek Mine, development activities include removing waste rock that separates the ore from the surface.

3.   Mining

The mining phase is the process of extracting ore from the ground, typically by blasting and mechanical removal.

4.   Processing

The processing phase generally includes three different stages:  (a) Milling or concentrating; (b) smelting; and (c)

refining.  Milling is the process of separating waste rock from ore, generally through chemical treatment, to produce "concentrate".  Copper concentrate, for example, is approximately 20-25 percent copper.  A mill or concentrator is built at or near virtually every mine in Ontario.

Smelting is the process of converting concentrate into a relatively pure product.  A copper smelter, for example, produces about 99 percent pure copper.

Refining is the process of producing pure metal from smelted product by heat-induced chemical reactions, electrolytic methods, solvent extraction, hydro metallurgical methods, or vapometallurigical methods.

It is rare for a mining company to buy mineral property outright in Ontario.  For this reason, Ontario mining companies typically do not incur high costs to acquire reserves and, consequently, do not have high cost depletion.

Small entities called junior exploration companies do much of the exploring for new mining properties in Ontario.  Typically, junior exploration companies do not have enough financial resources to produce the ore they find.  The junior company, once it has identified a body of ore, usually enters into an agreement with an established producer under which the producer does additional work on the property in exchange for an ownership interest in it.  If the additional work by the senior

company shows that the property should be developed, the junior company and the senior company typically agree for the junior company to keep an ownership interest in the property.

C.   The Ontario Mining Tax (OMT)

1.   Application of the OMT

The OMT applies to every mine in Ontario to the extent that its OMT profits exceed a statutory exemption.  Mining Tax Act (MTA), Rev. Stat. Ont. (R.S.O.), ch. 140, sec. 3 (1972).  In most cases, the OMT is imposed on the mine operator.  Id. sec. 2(2). The mine operator is the party that has the right to produce and sell minerals from the mine.  Id. sec. 1(g).  The OMT does not apply to holders of royalties.

2.   OMT Profit

Profit for OMT purposes is the difference between either gross receipts from production or pit's mouth value and certain expenses, payments, allowances, and deductions.  Id. sec. 3(3). Under the MTA, there are three ways to calculate the amount from which deductions and allowances are subtracted to compute profit for OMT purposes.  Id. sec. 3(3)(a), (b), and (c).  First, if an OMT taxpayer sells ore without processing it, gross revenues are the total receipts from selling the ore.  Id. sec. 3(3)(a). Second, if an OMT taxpayer processes ore before selling it, the OMT taxpayer subtracts deductions and allowances from the market value at the pit's mouth of the mined minerals.  Id. sec.

(3)(3)(b). Third, if an OMT taxpayer does not know the market value of the output at the pit's mouth, deductions and allowances are subtracted from the value of the ore at the pit's mouth as appraised by the mine assessor to compute profit for OMT purposes. Id. sec. (3)(3)(c).

Most OMT taxpayers use the third method, also known as the "appraisal" method, to calculate profit for OMT purposes. This method is not based on the on-site value of ore; it is based on financial statements and other information included on an OMT return.

The OMT exempts some taxable profit. Ontario has increased the exemption over the years. The statutory exemption was (a) $10,000 before 1969, MTA, R.S.O., ch. 242, sec. 3(1) (1960); (b) $50,000 from 1969 to 1973, An Act to Amend The Mining Tax Act, R.S.O. ch. 69, sec. 2(1) (1969); (c) $100,000 from 1974 to 1979, An Act to Amend The Mining Tax Act of 1972, R.S.O. ch. 132, sec. 2(1) (1975); and (d) $250,000 beginning in 1979, An Act to Amend The Mining Tax Act of 1972, R.S.O. ch. 40, sec. 1 (1979).

3. Deductions for Expenses

An OMT taxpayer calculates its profit for OMT purposes by deducting specified expenses from either the pit's mouth value or its gross receipts from production. MTA, R.S.O., ch. 140, sec. 3(3). The MTA allows an OMT taxpayer to deduct expenses for: (a) Scientific research in Canada relating to mining in Ontario

(added MTA, R.S.O., ch. 269, sec. 3(7)(d) (1980)); (b) working the mine above and below the ground, including salaries and wages for miners and office workers; (c) operations and maintenance (added MTA, R.S.O., ch. 269, sec. 3(7)(d) (1980)); (d) power and light for mining; (e) transportation of minerals; (f) food and provisions; (g) explosives, fuel, and other supplies; (h) safeguarding the mine and its output; (i) insurance on the output, mining plant, machinery, equipment, and buildings; (j) depreciation of the mining plant, machinery, equipment, and buildings; (k) charitable donations; and (l) certain costs of developing a mine. Id. sec. 3(3)(d) through (n). In 1978, 1979 and 1980, an OMT operator could claim a depreciation allowance from 5 to 15 percent of the remaining undepreciated cost of its depreciable assets. Id. sec. 3(3)(k) (1972).

An OMT taxpayer may not deduct expenses for (a) plant, machinery, equipment, or buildings except as described above; (b) investment capital, investment interest, or stock dividends; (c) depreciation in the value of the mine, mining land, or mining property due to exhaustion of the ore or mineral; (d) royalties paid for the output of a mine on private (i.e., non-Crown) land; and (e) the cost of developing a mine, except as described above. Id. sec. 3(4). Exploration expenses were not recoverable in 1965, but are recoverable in the years in issue.

4.    Processing Allowance

Most OMT taxpayers can deduct a processing allowance under the third method for calculating OMT profit.[1]  Id. sec. 3(3)(c)(i) and (ii) (as amended in 1975); Ont. Rev. Regs. 126/75, sec. 4 (1975).  During the years in issue, the processing allowance was calculated at a rate prescribed by the regulations or determined by the mine assessor.  MTA,  R.S.O.,  ch. 269, sec. 3(7)(c)(ii).  The processing allowance was a percentage of the cost of assets used to process a mined product (asset cost basis) or a percentage of profits from mining and processing activities (combined profits).  Ont. Rev. Regs. 126/75, sec. 5 (1975).  An OMT taxpayer which used the asset cost basis method multiplied the original cost of assets by a percentage which varied based on which processing assets the mine operator owned (e.g., concentrator, smelter, refinery, and semi-fabricating plant) and where those assets were located (e.g., in Northern Ontario).  Id.

The minimum processing allowance was 15 percent of combined profits.  Id. sec. 5(5).  The maximum processing allowance was 65 percent of the OMT taxpayer's combined profits.  Id.

Most mine operators claimed the 65 percent amount.  The processing allowance was zero if an operator had no taxable

---

[1]The processing allowance is not available to mining companies that do not process mined material, e.g., gypsum, salt, etc.  These are very insignificant in numbers and dollars in Ontario.

profits or had a loss for a taxable year.  There is nothing analogous to the processing allowance in financial accounting.

   5.   Calculating OMT Liability

Most OMT taxpayers started to calculate the OMT with net income from mining and processing reported on their financial statements.  OMT taxpayers adjusted their financial statement net income by adding expenses which the MTA did not allow to be recovered and subtracting items of income not related to Ontario mining and processing.  OMT taxpayers made these adjustments by reconciling OMT taxable income and financial statement net income.  OMT taxpayers computed taxable profit by deducting specified expenses, payments, allowances, and deductions as described above.  MTA, R.S.O., ch. 140, sec. 3(3) (1972).

D.   The Mine Assessor

During the years in issue, the Mine Assessor was responsible for enforcing the Mining Tax Act.  The Mine Assessor encouraged taxpayers to comply with the MTA, administered the MTA, interpreted and applied the MTA and its regulations, recommended policy related to mineral taxation, and developed and implemented tax assessment standards.  The Mine Assessor reviewed all OMT returns, either confirmed or changed the liability that the OMT taxpayer reported, and assessed the OMT due from operators.

Mine operators who disagreed with the Mine Assessor's determinations could appeal to the Minister of Natural Resources.

The Minister of Natural Resources referred the appeal to the Mining Commissioner or the Ontario Municipal Board to be tried and decided.

In 1986, the position of Mine Assessor was renamed Senior Manager of the Mining Tax.  In 1993, it was renamed Manager of the Mining Tax.  The duties of these positions are the same as those of the Mine Assessor described above.

Kumara Rachamalla (Rachamalla) was appointed Mine Assessor in 1980 and served in that position (as renamed) until the date of trial.

E.   Texasgulf Canada's OMT Liability, Nonrecoverable Expenses, and Processing Allowance

Texasgulf Canada's total processing allowance for 1968 to 1980 was Can$468,106,000, and its nonrecoverable expenses were Can$340,787,000.  Texasgulf Canada had financial statement net income, OMT profit and depreciation, nonrecoverable expenses, and processing allowances as follows:

(Thousands of Can$)

| Year | OMT Profit | Financial Statement Net Income | OMT Depreciation | Nonrecoverable Expenses | Processing Allowance |
|------|-----------|-------------------------------|------------------|------------------------|---------------------|
| 1968 | 56,814 | 68,843 | 11,710 | 8,712 | 10,026 |
| 1969 | 47,423 | 61,049 | 12,384 | 10,793 | 8,368 |
| 1970 | 46,834 | 62,730 | 14,509 | 10,203 | 8,264 |
| 1971 | 32,033 | 49,479 | 16,057 | 11,705 | 6,032 |
| 1972 | 33,559 | 43,844 | 9,100 | 23,000 | 17,843 |
| 1973 | 99,548 | 109,706 | 9,591 | 31,809 | 22,985 |
| 1974 | 109,383 | 162,537 | 32,503 | 32,400 | 37,973 |
| 1975 | 34,737 | 90,809 | 30,081 | 21,042 | 42,622 |
| 1976 | 32,529 | 79,506 | 16,296 | 25,545 | 60,411 |
| 1977 | 100 | 39,515 | 54,147 | 27,245 | 185 |
| 1978 | 6,521 | 38,610 | 57,843 | 38,378 | 12,111 |
| 1979 | 51,742 | 130,249 | 6,755 | 39,827 | 96,092 |
| 1980 | 78,181 | 199,546 | 14,636 | 60,128 | 145,194 |
| Total | 629,404 | 1,136,423 | 285,612 | 340,787 | 468,106 |

The nonrecoverable expenses are as follows:

| Year | Financial Statement Depreciation | Interest | Private Royalties | Other Non-recoverable Expenses | Total |
|------|----------------------------------|----------|-------------------|-------------------------------|-------|
| 1968 | 5,188 | -0- | 3,249 | 275 | 8,712 |
| 1969 | 5,589 | -0- | 2,959 | 2,245 | 10,793 |
| 1970 | 4,213 | 146 | 5,425 | 419 | 10,203 |
| 1971 | 4,089 | 4,031 | 3,074 | 511 | 11,705 |
| 1972 | 6,757 | 12,072 | 2,787 | 1,384 | 23,000 |
| 1973 | 9,577 | 15,590 | 5,011 | 1,631 | 31,809 |
| 1974 | 8,246 | 11,879 | 8,639 | 3,636 | 32,400 |
| 1975 | 6,553 | 8,289 | 5,037 | 1,163 | 21,042 |
| 1976 | 8,221 | 10,769 | 3,428 | 3,127 | 25,545 |
| 1977 | 7,771 | 14,820 | 485 | 4,169 | 27,245 |
| 1978 | 10,993 | 21,521 | 2,451 | 3,413 | 38,378 |
| 1979 | 8,321 | 24,009 | 2,569 | 4,928 | 39,827 |
| 1980 | 9,937 | 30,688 | 10,743 | 8,760 | 60,128 |
| Total | 95,455 | 153,814 | 55,857 | 35,661 | 340,787 |

F.   Comparison of Processing Allowances and Nonrecoverable Expenses for Other OMT Taxpayers

From 1968 to 1980, the processing allowance exceeded nonrecoverable expenses for most OMT taxpayers. For those years, total processing allowances claimed by OMT taxpayers were more than three times greater than nonrecoverable expenses. Total

processing allowances exceeded nonrecoverable expenses each year from 1968 to 1980 except 1971 and 1977.

G.    Respondent's Determination and Petitioner's Election

On March 29, 1989, respondent issued a notice of deficiency to petitioner for 1979, 1980, and 1981.  Respondent did not determine a deficiency for 1978, but adjusted petitioner's net operating loss to be carried forward from 1978 to 1979. Petitioner timely elected for section 1.901-2, Income Tax Regs., to apply in deciding whether its OMT and other Canadian taxes are creditable under section 901.

## OPINION

A.    Background and Contentions of the Parties

The parties dispute whether the OMT is creditable under section 901.  Our decision on this issue depends on whether the OMT is an income tax under section 1.901-2, Income Tax Regs.

A taxpayer may deduct foreign taxes unless the taxpayer elects and is entitled to use the foreign tax credit.  Sec. 901(a).  If a taxpayer is a citizen or a domestic corporation, the taxpayer may be entitled to a credit for any income, war profits, and excess profits tax paid or accrued during the taxable year to a foreign country or possession of the United States.  Sec. 901(b)(1).[2]

---

[2]    SEC. 901(b) provides in pertinent part:

(continued...)

The purpose of the foreign tax credit is to "mitigate the evil of double taxation" of domestic corporations on income from foreign sources. Burnet v. Chicago Portrait Co., 285 U.S. 1, 7 (1932); New York & Honduras Rosario Mining Co. v. Commissioner, 168 F.2d 745, 747 (2d Cir. 1948), revg. and remanding 8 T.C. 1232 (1947). A credit against U.S. income tax is, in effect, an exemption from taxation, and is dependent upon legislative grace. Keasbey & Mattison Co. v. Rothensies, 133 F.2d 894, 898 (3d Cir. 1943). A taxpayer who claims a foreign tax credit must show that it clearly comes within the statute that allows the credit. Id. Petitioner bears the burden of proof. Rule 142(a). The "reaches of the word 'income' in section 901(b)(1) have been the subject of a long and tortuous history" in terms of legislative background, the decided cases, and respondent's rulings, which history is "permeated" with "vagaries, confusion, and * * * contradictions". Bank of America Natl. Trust & Sav. Association v. Commissioner, 61 T.C. 752, 759 (1974), affd. without published

---

[2](...continued)
    Sec. 901(b). Amount Allowed.--Subject to the limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

        (1) Citizens and domestic corporations.--In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States * * *

opinion 538 F.2d 334 (9th Cir. 1976).  In Bank of America Natl. Trust & Sav. Association v. United States, 198 Ct. Cl. 263, 459 F.2d 513, 523 (1972), the U.S. Court of Claims concluded that an income tax for purposes of section 901(b):

> covers all foreign income taxes designed to fall on some net gain or profit, and includes a gross income tax if, but only if, that impost is almost sure, or very likely, to reach some net gain because costs or expenses will not be so high as to offset the net profit. [Fn. ref. and citation omitted.]

B.   Section 1.901-2, Income Tax Regs.

Respondent proposed regulations under section 901 in 1979, sec. 1.901-2, Proposed Income Tax Regs., 44 Fed. Reg. 36071 (June 20, 1979), and issued temporary regulations in 1980, sec. 4.901-2, Temporary Income Tax Regs., 45 Fed. Reg. 75647 (Nov. 17, 1980); see Phillips Petroleum Co. v. Commissioner, 104 T.C. 256, 285 (1995)(construing these temporary regulations).  On April 5, 1983, respondent issued new proposed regulations.  Sec. 1.901-2, Proposed Income Tax Regs., 48 Fed. Reg. 14640 (Apr. 5, 1983). The regulations under section 901, section 1.901-2, Income Tax Regs., were adopted on October 12, 1983.  T.D. 7918, 1983-2 C.B. 113.  The parties do not dispute that the regulations apply to petitioner for the years in issue.

To understand how the regulations apply here, we must consider a series of defined terms and phrases in the regulations.  We begin with the definition of income tax.  The regulations define income tax as follows:

§ 1.901-2.  Income, war profits, or excess profits tax paid or accrued.--(a)  Definition of income, war profits, or excess profits tax--(1) In general.  * * * Whether a foreign levy is an income tax is determined independently for each separate foreign levy.  A foreign levy is an income tax if and only if--

(i)  It is a tax; and

(ii) the predominant character of that tax is that of an income tax in the U.S. sense.

Except to the extent otherwise provided in paragraphs (a)(3)(ii) and (c) of this section, a tax either is or is not an income tax, in its entirety, for all persons subject to the tax. * * *

Sec. 1.901-2(a)(1), Income Tax Regs.

Respondent concedes that the OMT is a tax under section 1.901-2(a)(2)(i), Income Tax Regs.  However, the parties dispute whether the "predominant character of the tax is that of an income tax in the U.S. sense."  The regulations describe that requirement as follows:

(3)  Predominant character.  The predominant character of a foreign tax is that of an income tax in the U.S. sense--

(i)  If, within the meaning of paragraph (b)(1) of this section, the foreign tax is likely to reach net gain in the normal circumstances in which it applies * * *

Sec. 1.901-2(a)(3), Income Tax Regs.

Thus, for a tax to be creditable under the regulations, it must be likely to reach net gain in the normal circumstances in

which it applies.[3]  Under the regulations, that standard is met "if and only if the tax, judged on the basis of its predominant character" meets specified realization, gross receipts, and net income requirements.  Sec. 1.901-2(b)(1), Income Tax Regs.  The regulations provide in part as follows:

> (b)  Net gain--(1)  In general.  A foreign tax is likely to reach net gain in the normal circumstances in which it applies if and only if the tax, judged on the basis of its predominant character, satisfies each of the realization, gross receipts, and net income requirements set forth in paragraphs (b)(2), (b)(3) and (b)(4), respectively, of this section.

Sec. 1.901-2(b)(1), Income Tax Regs.

Respondent concedes that the OMT meets the realization and gross receipts requirements but contends that it does not meet the net income requirement of section 1.901-2(b)(4), Income Tax Regs.  Thus, for present purposes the OMT is creditable, according to section 1.901-2(b)(1), Income Tax Regs., "if and only if" it meets the net income requirement.

A foreign tax meets the net income requirement of section 1.901-2(b)(4), Income Tax Regs.,[4] if, judged on the basis of its

------

[3]This standard was first used in <u>Bank of America Natl. Trust & Sav. Association v. United States</u>, 198 Ct. Cl. 263, 459 F.2d 513, 517-518 (1972).  One commentator said that "Fortunately, the regulations provide specific tests for determining whether the general <u>Bank of America</u> standard is satisfied."  Dolan, "General Standards of Creditability Under Sections 901 and 903 Final Regulations -- New Words, Old Concepts", 13 Tax Mgt. Intl. J. (BNA) 167, 169 (1984).

[4] Sec. 1.901-2(b)(4), Income Tax Regs., provides:

(continued...)

predominant character, the base of the tax is computed by

reducing gross receipts to permit --

(1) recovery of significant costs and expenses attributable

to gross receipts, sec. 1.901-2(b)(4)(i)(A), Income Tax Regs.; or

(2) recovery of significant costs and expenses computed

under a method that is likely to produce an amount that

approximates, or is greater than, recovery of such significant

costs and expenses, sec. 1.901-2(b)(4)(i)(B), Income Tax Regs.

A foreign tax also meets the net income requirement of

section 1.901-2(b)(4), Income Tax Regs., if it provides

allowances that "effectively compensate" for nonrecovery of

---

[4](...continued)
(4)  Net income -- (i)  In general.  A foreign tax
satisfies the net income requirement if, judged on the
basis of its predominant character, the base of the tax
is computed by reducing gross receipts (including gross
receipts as computed under paragraph (b)(3)(i)(B) of
this section) to permit--

(A)  Recovery of the significant costs and
expenses (including significant capital expenditures)
attributable, under reasonable principles, to such
gross receipts; or

(B)  Recovery of such significant costs and
expenses computed under a method that is likely to
produce an amount that approximates, or is greater
than, recovery of such significant costs and expenses.

A foreign tax law that does not permit recovery of one
or more significant costs or expenses, but that
provides allowances that effectively compensate for
nonrecovery of such significant costs or expenses, is
considered to permit recovery of such costs or
expenses.  * * *

significant costs or expenses.  Sec. 1.901-2(b)(4) (flush language), Income Tax Regs.  Petitioner prevails if the OMT meets one or more of these net income requirements.

A recap may be helpful.  The task of deciding whether the predominant character of the OMT is that of an income tax in the U.S. sense is simplified because the terms and clauses in the regulations just described tie the "predominant character" inquiry to several specific tests.  To summarize, for a tax to be creditable:

1.    Its predominant character must be that of an income tax in the U.S. sense.  Sec. 1.901-2(a)(1)(ii), Income Tax Regs.

2.    Its predominant character is that of an income tax in the U.S. sense if it is "likely to reach net gain in the normal circumstances in which it applies".  Sec. 1.901-2(a)(3)(i), Income Tax Regs.

3.    It is likely to reach net gain in the normal circumstances in which it applies if and only if the tax, judged on the basis of its predominant character, meets (among other requirements) the net income requirement.  Sec. 1.901-2(b)(1), Income Tax Regs.

4.    It meets the net income requirement if, judged on the basis of its predominant character,[5] it meets one of three tests.

---

[5]To borrow a phrase, the "reader by now has divined that 'predominant character' is the leitmotif of the 1983

(continued...)

Sec. 1.901-2(b)(4), Income Tax Regs. We next consider whether it meets one of these tests.

C. Whether the OMT Meets the Net Income Requirement in Section 1.901-2(b)(4)(i)(B), Income Tax Regs.

Under one of the three net income tests, a tax meets the net income requirement if, judged on the basis of its predominant character, the base of the tax is computed by reducing gross receipts to permit recovery of significant costs and expenses under a method that is likely to produce an amount that approximates or exceeds recovery of such significant costs or expenses. Sec. 1.901-2(b)(4)(i)(B), Income Tax Regs. Because of respondent's concessions, the OMT is creditable if it meets that test.

1. Consideration of Representative OMT Data

Petitioner offered evidence intended to prove that the processing allowance is likely to approximate or exceed nonrecoverable expenses. Petitioner's evidence consisted of a broadly representative study of OMT tax returns filed from 1968 to 1980. Petitioner's study showed that the processing allowance far exceeded the nonrecoverable expenses both in the aggregate for all returns studied and for a large majority of OMT returns.

---

[5](...continued) regulations." Isenbergh, "The Foreign Tax Credit: Royalties, Subsidies, and Creditable Taxes", 39 Tax L. Rev. 227, 272 (1984).

We agree with petitioner that use of broadly representative data is an appropriate way to show whether the processing allowance is likely to exceed nonrecoverable expenses. Two factors lead us to that conclusion. First, both the processing allowance and the amount of nonrecoverable expenses vary from year to year and from taxpayer to taxpayer. Whether one is likely to exceed the other is a factual question. Accord Texasgulf, Inc. v. United States, 17 Cl. Ct. 275 (1989), modified per order (Apr. 16, 1992). Whether the processing allowance is likely to approximate or exceed nonrecoverable expenses can be shown by actual OMT data. Second, we think it is appropriate to consider industry data because a foreign tax either is or is not an income tax, in its entirety, for all persons subject to it. Sec. 1.901-2(a)(1) (flush language), Income Tax Regs.[6] Whether a tax is creditable for all persons subject to it can be shown by multiyear data from a broadly representative group of taxpayers subject to the tax.

2.   Expert Testimony

Petitioner's expert was Robert B. Parsons (Parsons). He prepared a report entitled "Study of Ontario Mining Tax Returns" (Parsons OMT Report) and an "Overview of the Ontario Mining

---

[6]See Dolan, supra note 3.

Industry".[7]  The Parsons OMT Report was based on a review of 213 OMT returns that represented about 80 percent of the total OMT paid from 1968 to 1980.  The mining operators which filed those returns had about 68 percent of Ontario's mineral production during that period.

William J. Hallett (Hallett) was respondent's expert.  He testified about the OMT returns that Parsons analyzed.  Parsons prepared a memorandum that rebutted parts of Hallett's testimony.

We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony exercising our sound judgment.  Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Fitts' Estate v. Commissioner, 237 F.2d 729, 732-733 (8th Cir. 1956), affg. T.C. Memo. 1955-269; IT & S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991).

3.  Petitioner's Study of OMT Taxpayers

Respondent concedes that the Parsons OMT Report included a representative cross-section of OMT taxpayers.  Only one significant taxpayer did not give its OMT tax returns to Parsons for the study.  Respondent's expert stated that this taxpayer's information would not have materially changed the results of the

---

[7]Kumara Rachamalla was petitioner's other expert. Respondent objected to our consideration of his report and testimony.  Canadian law precluded him from revealing the data upon which he based his opinion and answering questions about this data on cross-examination.  He agreed with Parsons' conclusion in every material aspect.  However, we have not considered his report or testimony in deciding this case.

Parsons OMT Report.  Parsons analyzed returns as filed; i.e.,
before assessment by the Mine Assessor.  Later, Parsons obtained
records of the Mine Assessor's adjustments to the filed returns.
He included assessment data in his rebuttal memorandum to the
extent it was available.  The parties stipulated that the data
(but not the opinions and conclusions) in the Parsons OMT Report
was accurate.

Of the 213 returns that Parsons reviewed, 145 returns (68.1
percent) reported OMT liability.  Nonrecoverable expenses exceed
the processing allowance on only 19 of the OMT returns which
reported OMT liability (15.8 percent).

The Parsons OMT Report shows that, in the aggregate,
processing allowances claimed by OMT taxpayers dwarfed
nonrecoverable expenses:

### Millions of Can$

| Year | Nonrecoverable Expenses | Processing Allowance |
|---|---|---|
| 1968 | 10.6 | 91.6 |
| 1969 | 9.7 | 76.3 |
| 1970 | 30.2 | 99.7 |
| 1971 | 39.6 | 36.9 |
| 1972 | 51.7 | 92.6 |
| 1973 | 54.1 | 140.6 |
| 1974 | 57.6 | 196.8 |
| 1975 | 61.6 | 252.2 |
| 1976 | 70.0 | 217.8 |
| 1977 | 73.3 | 43.2 |
| 1978 | 83.4 | 94.7 |
| 1979 | 64.1 | 321.8 |
| 1980 | 99.3 | 573.5 |
| Total | 705.2 | 2,237.7 |
| Average | 54.3 | 172.1 |

For the 13-year period, the total amount of processing allowance claimed on returns in the Parsons OMT Report was Can$2,237,700,000, which is more than three times the total amount of nonrecoverable expenses (Can$705,200,000).

Parsons concluded that the aggregate amount of processing allowance claimed by OMT taxpayers in his report exceeded their aggregate amount of nonrecoverable expenses by 3.2 to 1. Respondent does not dispute that conclusion. Total processing allowances claimed on returns exceeded nonrecoverable expenses for 11 of the 13 years in the Parsons OMT Report.

The Parsons OMT Report also shows that the processing allowances claimed by the vast majority of OMT taxpayers in the study exceeded those taxpayers' nonrecoverable expenses. The Parsons OMT Report also shows that nonrecoverable expenses exceeded processing allowances in 21 of 145 returns from eight OMT taxpayers.

### 4. Respondent's Expert

Hallett concluded that nonrecoverable expenses exceeded the processing allowance in only 60 of 213 OMT returns in the Parsons OMT Report if all OMT returns are considered, whether or not tax was due. Nineteen of those 60 returns were from taxpayers that owed OMT.

Hallett stated his opinion that the nonrecoverable expenses were significant. His opinion, even if correct, does not affect

the result here.  We need not decide whether nonrecoverable costs
are significant because we decide the case by considering whether
the processing allowance is likely to exceed nonrecoverable
expenses under section 1.901-2(b)(4)(i)(B), Income Tax Regs.  The
question under section 1.901-2(b)(4)(i)(B), Income Tax Regs, is
not whether the nonrecoverable expenses are significant; it is
whether the processing allowance is likely to approximate or
exceed them.[8]

5.  Conclusion

Petitioner has shown that the processing allowance exceeded
nonrecoverable expenses both in the aggregate and for the vast
majority of OMT taxpayers.  We conclude that the OMT processing
allowance was likely to approximate or exceed the nonrecoverable
expenses for the years in issue.

D.  Respondent's Contentions

Respondent contends that petitioner has not proven that the
OMT meets the requirements of section 1.901-2(b)(4)(i)(B), Income
Tax Regs., because, according to respondent, (1) this case is
governed by cases decided before the 1983 regulations applied,

---

[8]Similarly, we need not decide the parties' dispute about
the concept of pit's mouth value.  Respondent contends that the
OMT's use of pit's mouth value shows that no nexus exists between
the amount of the processing allowance and nonrecoverable
expenses.  Sec. 1.901-2((b)(4)(i)(B), Income Tax Regs., requires
us to consider whether the processing allowance approximates or
exceeds nonrecoverable expenses, not whether there is a nexus
between the two.  See par. D-3, infra p. 33.

such as <u>Inland Steel Co. v. United States</u>, 230 Ct. Cl. 314, 677 F.2d 72 (1982); and also by <u>Texasgulf, Inc. v. United States</u>, 17 Cl. Ct. 275 (1989); (2) the OMT is not creditable unless its predominant character is that of an income tax for each OMT taxpayer; and (3) for the OMT to be creditable, the processing allowance must have been intended to compensate for nonrecoverable expenses.  We address each of these contentions next.

1.    <u>Extent To Which This Case Is Governed by Cases Decided Before the Regulations Were Issued and by Texasgulf, Inc. v. United States</u>

a.    <u>Preamble to the 1983 Regulations</u>

Respondent contends that the OMT is not creditable because it fails to meet standards of creditability applied in cases decided before the regulations were issued.  Respondent contends that the Preamble to section 1.901-2, Income Tax Regs., shows that the regulations adopted prior case law.  We disagree; the preamble does not support respondent's broad use of the preregulation cases.

The preamble to the final regulations under section 901, T.D. 7918, 1983-2 C.B., 113, 114, states in part:

> Under these final regulations, the predominant character of a foreign tax is that of an income tax in the U.S. sense if the foreign tax is likely to reach net gain in the normal circumstances in which it applies.  This standard, found in §1.901-2(a)(3)(i), adopts the criterion for creditability set forth in <u>Inland Steel Company v. U.S.</u>, 677 F.2d 72 (Ct. Cl. 1982), <u>Bank of America National Trust and Savings</u>

<u>Association v. U.S.</u>, 459 F.2d 513 (Ct. Cl. 1972), and <u>Bank of America National Trust and Savings Association v. Commissioner</u>, 61 T.C. 752 (1974).  The regulations set forth three tests for determining if a foreign tax is likely to reach net gain: the realization test, the gross receipts test, and the net income test.  All of these tests must be met in order for the predominant character of the foreign tax to be that of an income tax in the U.S. sense.

The preamble states that the regulations adopt the creditability criterion from certain cases to use in deciding whether the predominant character of a foreign tax is likely to reach net gain for purposes of section 1.901-2(a)(3)(i), Income Tax Regs.  The preamble states that a tax is likely to reach net gain if it meets three tests provided in the regulations.  The regulations provide objective and quantitative standards that were not used in cases which decided creditability of foreign taxes before the regulations became final.  Regulations can supersede prior case law to the extent that they provide requirements and definitions not found in prior case law.  See <u>Bowater Inc. v. Commissioner</u>, 101 T.C. 207, 212 (1993); <u>Nissho Iwai American Corp. v. Commissioner</u>, 89 T.C. 765, 776-777 (1987).

b.   <u>Inland Steel Co. v. United States and Texasgulf, Inc. v. United States</u>

Respondent contends that <u>Inland Steel Co. v. United States</u>, <u>supra</u>, and <u>Texasgulf, Inc. v. United States</u>, <u>supra</u>, establish as a matter of law that the OMT is not creditable.  We disagree with respondent's contention that either of those cases decided the issue before us here.

The U.S. Court of Claims held in <u>Inland Steel Co. v. United States</u>, <u>supra</u>, that the OMT was not creditable and that, for 1964 and 1965, the OMT paid by Caland Ore Co. did not fit the U.S. concept of an income tax primarily because there were significant nonrecoverable expenses (i.e., land expenses, rent, and private royalties).  <u>Id.</u> at 85, 87.  In <u>Inland Steel</u>, the U.S. Court of Claims evaluated Caland data for 1964 and 1965.  In 1964, Caland could not claim a processing allowance because it sold only unprocessed ore.  <u>Id.</u> at 79, 81.  In 1965, Caland could claim a processing allowance equal to not less than 15 percent or more than 65 percent of the profits of the combined mining and processing operations because it sold both unprocessed ore and processed iron pellets.  <u>Id.</u> at 81.  Caland reported the minimum 15 percent of combined profits processing allowance on its OMT return for 1965.  <u>Id.</u>  The record in that case did not include OMT returns for any other OMT taxpayers or any other years.

The U.S. Court of Claims decided <u>Inland Steel</u> before the 1983 regulations were issued.  In <u>Inland Steel</u>, the U.S. Court of Claims analyzed the history and purpose of the OMT and held that a foreign tax was creditable only if it was the "substantial equivalent" of an income tax in the United States.  <u>Id.</u> at 79; see also <u>New York & Honduras Rosario Mining Co. v. Commissioner</u>, 168 F.2d at 749.  The 1979 proposed regulations included a form of the substantial equivalence test.  Sec. 1.901-2(c), Proposed

Income Tax Regs., 44 Fed. Reg. 36074 (June 20, 1979). However, this standard was dropped by the final regulations issued in 1983 and replaced with a "predominant character" test. The use of the "predominant character" and "effectively compensates" tests in section 1.901-2(b)(4), Income Tax Regs., is a change from the history and purpose approach used in the cases decided before the 1983 regulations applied a factual, quantitative approach. This change to a quantitative approach is also made by the provision of the 1983 regulations which provides that the predominant character of a foreign tax is that of an income tax in the U.S. sense, if, among other things, the foreign tax "is likely to reach net gain in the normal circumstances in which it applies". Sec. 1.901-2(a)(3)(i), Income Tax Regs.

We have considered the parties' use of industry data in this case. See par. C-1, supra p. 21. The record contains broadly representative data which shows that the OMT processing allowance effectively compensates for the disallowed deductions. See par. C-3 and 4, supra pp. 22, 24. The U.S. Court of Claims in Inland Steel Co. v. United States, 230 Ct. Cl. 314, 677 F.2d 72 (1982), did not have industry-wide data to consider, and the Secretary had not yet promulgated regulations using a quantitative approach. The court in Inland Steel did not discuss the relationship between nonrecoverable expenses and the OMT processing allowance. Based on the Parsons OMT Report, Caland's

situation was unusual because most OMT taxpayers could and did claim a processing allowance equal to 65 percent of the maximum combined profits.  Thus, the use of the processing allowance by Caland was not typical.  For the foregoing reasons, we conclude that we are not bound by Inland Steel in deciding this case.[9]

Respondent points out that Inland Steel Co. v. United States, supra, focused on the significance of expenses that are nonrecoverable under the OMT.  As discussed in paragraph C-4, supra p. 25, we need not decide whether the nonrecoverable expenses are significant under section 1.901-2(b)(4)(i)(A), Income Tax Regs., because we hold that petitioner meets the requirements under section 1.901-2(b)(4)(i)(B), Income Tax Regs.

In Texasgulf, Inc. v. United States, 17 Cl. Ct. 275 (1989), the U.S. Claims Court granted the Government's motion for partial summary judgment.  The U.S. Claims Court later modified that ruling in an unpublished order.  Texasgulf, Inc. v. United States, No. 532-83T (Cl. Ct., Apr. 16, 1992) (order partially denying summary judgment).  In that order, the U.S. Claims Court reaffirmed its opinion in Texasgulf, Inc. v. United States, supra, that nonrecoverable expenses under the OMT were significant as a matter of law under Inland Steel Co. v. United States, 677 F.2d at 85.  However, in that order, the U.S. Claims

---

[9]We note also that exploration expenses were not recoverable in Inland Steel Co. v. United States, 230 Ct. Cl. 314, 677 F.2d 72 (1982), but are fully recoverable in the years in issue.

Court reversed its holding that the OMT processing allowance does not effectively compensate for expenses that may not be recovered under the OMT as a matter of law.  Texasgulf, Inc. v. United States, No. 532-83T (Cl. Ct. Apr. 16, 1992) (order partially denying summary judgment).  Thus, the U.S. Claims Court treats that issue as a question of fact.  The U.S. Claims Court left for decision based on an appropriate record the question whether the OMT processing allowance effectively compensates for the disallowed deductions.  Texasgulf, Inc. v. United States, No. 532-83T (Cl. Ct. Apr. 16, 1992) (order partially denying summary judgment).  Our record enables us to make a factual finding on this point; as discussed above, we have found that, judged on the predominant character of the OMT, the processing allowance is likely to exceed nonrecoverable expenses.

2.  Whether the Predominant Character of the OMT Must Be An Income Tax in the U.S. Sense for Each Taxpayer

Respondent contends that, for a tax to be creditable, its predominant character must be that of an income tax in the U.S. sense for each taxpayer subject to it.  Respondent bases this argument on the following language from the regulations:  "a tax either is or is not an income tax, in its entirety, for all persons subject to the tax."  Sec. 1.901-2(a)(1) (flush language), Income Tax Regs.  We disagree.  This phrase does not mean that, to be creditable, a tax must be an income tax for each taxpayer subject to it; it means that a tax is creditable by

either all, or none, of the taxpayers subject to it, regardless of variations in how the tax applies to each taxpayer subject to it.

Respondent contends that petitioner may not use aggregate data to show that the OMT is creditable. Respondent also contends that if we adopt petitioner's position, the Commissioner would be required to evaluate each OMT taxpayer every year to determine whether its OMT payment was creditable. We disagree. Use of aggregate data is appropriate because a tax is or is not creditable for all taxpayers subject to it. This conclusion does not require the Commissioner to evaluate each OMT taxpayer every year to determine whether its OMT payment is creditable.

3. Whether the Processing Allowance Must Be Intended To Compensate for Nonrecoverable Expenses

Respondent contends that, for the OMT to be creditable, the processing allowance must be intended to compensate for nonrecoverable expenses. Respondent points out that the processing allowance is computed without considering the amount of nonrecoverable expenses and contends that the amount of one bears no predictable relationship to the amount of the other. Respondent contends that the fact that the processing allowance exceeds nonrecoverable expenses for most OMT taxpayers does not make the OMT creditable because that relationship is coincidental. We disagree.

The regulations do not provide that the processing allowance must bear a predictable relationship to nonrecoverable expenses. The regulations do provide that a foreign tax meets the net income requirement if (among other requirements), judged by its predominant character, the tax permits the recovery of nonrecoverable expenses under a method that is likely to produce an amount that approximates or is greater than the amount of the nonrecoverable expenses. Sec. 1.901-2(b)(4)(i)(B), Income Tax Regs. The effect of respondent's position would be to exclude from section 1.901-2(b)(4)(i)(B), Income Tax Regs., the words "or is greater than".

E.  Conclusion

We conclude that the OMT processing allowance meets the requirements of section 1.901-2(b)(4)(i)(B), Income Tax Regs., and that the OMT is creditable under section 901 for the years in issue.

To reflect the foregoing and concessions,

Decision will be entered under Rule 155.